[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 75 
Michael Shannon Taylor was convicted of the capital murders of Ivan Moore and his wife Lucille, and the trial judge sentenced him to death following the jury's recommendation of that sentence. We affirm both the convictions and his death sentence.
On November 4, 1991, Taylor, then a 19-year-old high school graduate who had returned to his hometown of Gadsden while absent without leave from the Navy, solicited a ride to the home of the Moores, an elderly couple he knew. Taylor left a duffel bag outside the house and asked Mr. Moore, who was age 83, if he could use the telephone. Once inside, Taylor pretended to make a telephone call, and then Mr. Moore asked him if he would like something to drink. Taylor said he would, and Mr. Moore got him a glass of water and a doughnut. After Taylor had eaten, Mr. Moore asked him if he would like something else. Taylor said he would, and Mr. Moore went back into the kitchen.
Taylor then went outside and removed a metal bar from his duffel bag. Taylor followed Mr. Moore into the kitchen, and, as the man bent into the refrigerator, Taylor began to strike him about the head with the metal bar. Mr. Moore fell to the floor. Mrs. Moore, who was age 79, entered the kitchen and bent down to see what was wrong with her husband. Taylor then struck her repeatedly about the head with the metal bar. As Mr. Moore attempted to crawl away and get up, Taylor again struck him with the bar. Taylor then took Mr. Moore's wallet, Mrs. Moore's purse, their checkbook, and their 1986 Cadillac automobile. He drove to Birmingham, cashed several checks made out to his name for a total of about $1500, and made several clothing and jewelry purchases at the Galleria shopping mall.
The Moores were discovered in their home by a neighbor two days after their beating. Mr. Moore was dead at that time; Mrs. Moore was then unconscious, but later died. The cause of both their deaths was severe blunt force injuries to their heads, which had fractured their skulls. Mr. Moore had been struck with the bar approximately 17 times and had 11 wounds on his head; Mrs. Moore had been struck with the bar at least 10 times.
Taylor was arrested outside the Galleria shopping mall, after he had entered the *Page 76 
Moores' vehicle and attempted to drive away. Upon being returned to Gadsden, Taylor confessed to beating the Moores during the course of a robbery. It is disputed whether he stated, while giving his confession, that he had intended to kill the Moores.
Taylor was indicted on two counts of murder committed during a robbery in the first degree, made capital by Ala. Code 1975, § 13A-5-40(a)(2), and on one count of murder of two or more persons during one act or course of conduct, made capital by §13A-5-40(a)(10). The jury returned a guilty verdict on all counts and unanimously recommended the death sentence. The trial judge imposed the recommended sentence.
Taylor appealed his convictions and sentence to the Court of Criminal Appeals, raising more than 25 issues. After remanding for the trial court to make specific written findings regarding each aggravating and mitigating factor, as required by Ala. Code 1975, § 13A-5-47(d), see Taylor v. State, 666 So.2d 36
(Ala.Crim.App. 1994), the Court of Criminal Appeals affirmed his convictions and sentence in Taylor v. State, 666 So.2d 71
(Ala.Crim.App. 1994). Because of Taylor's death sentence, we automatically granted his petition for a writ of certiorari to review his convictions and sentence. Rule 39(c), A.R.App.P.
Taylor has raised 25 issues for our review; all were raised on appeal to the Court of Criminal Appeals and were discussed in that court's lengthy opinion. We have thoroughly reviewed all those issues. We also have carefully reviewed the record for "plain error," in accordance with Rule 39(k), Ala.R.App.P., and we have found none. We discuss here only the three issues that Taylor's counsel specifically addressed on oral argument before this Court. As to the other issues raised by Taylor, we find no error in the opinion of the Court of Criminal Appeals.
 I. Alleged Juror Bias in Favor of the Death Penalty
Taylor contends that he should receive a new trial, because, he claims, his right to due process of law under the Fourteenth Amendment of the United States Constitution was violated when the trial judge failed to strike for cause three prospective jurors that Taylor claimed were fixed in their opinion that death would be the only appropriate sentence if he were found guilty. Taylor also claims that one of the three prospective jurors should have been struck for another cause, claiming that that prospective juror viewed Taylor's young age, a statutory mitigating factor, as an aggravating factor in determining the appropriate sentence. Taylor argues that because he was forced to use preemptory strikes to remove these prospective jurors from the jury, he was not able to freely strike a jury from a body of impartial prospective jurors, and that this situation violated the requirements of Morgan v. Illinois, 504 U.S. 719,112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); Wainwright v. Witt,469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); and Ex parteBeam, 512 So.2d 723 (Ala. 1987).
In response, the State contends that these three prospective jurors were impartial and did not have a fixed opinion regarding death as the proper sentence in this case, but, rather, only stated that they thought death would be the appropriate sentence, given the hypothetical facts provided to them by defense counsel on voir dire examination. The State argues that the trial court was not required to strike these prospective jurors for cause, because each of them stated that he would be able to render a verdict based on the evidence presented and would consider any mitigating factors. CitingThomas v. State, 539 So.2d 375 (Ala.Crim.App.), affirmed,539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910,109 S.Ct. 3201, 105 L.Ed.2d 709 (1989), the State notes that under Alabama law, a trial court's ruling on challenges for cause will be accorded great weight and will not disturbed on appeal unless shown to be an abuse of discretion, which, the State says, Taylor has not shown.
In reviewing this issue, we first keep in mind that "[n]o right of an accused felon is more basic than the right to 'strike' a petit jury from a panel of fair-minded, impartial prospective jurors." Ex parte Beam, 512 So.2d at 724. InMorgan, the United States Supreme Court held that a capital murder defendant has the constitutional right to conduct voir dire examination of prospective jurors *Page 77 
to inquire whether they "would unwaveringly impose death after a finding of guilt." 504 U.S. at 732, 112 S.Ct. at 2232. The trial judge allowed Taylor such an opportunity, and he acted upon it; Taylor's counsel extensively questioned the prospective jurors regarding their views on sentencing. Thus, the focus here is on the specific statements made by the three prospective jurors in response to that questioning. We must determine whether the views expressed by those prospective jurors required that they be struck for cause.
As to whether the three prospective jurors were impermissibly biased in favor of the death penalty, we note that the applicable standard was explained by the United States Supreme Court in Morgan:
 "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. . . . Even if one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."
504 U.S. at 727-31, 112 S.Ct. at 2229-30 (emphasis added). Under that standard, a prospective juror is disqualified if he is so biased in favor of the death penalty that he would automatically vote to impose it in every case, regardless of the evidence presented and the trial court's instructions to consider both aggravating and mitigating factors.[1]
We find it critical that, before questioning each panel of prospective jurors, Taylor's counsel presented in extensive detail the evidence he believed would be presented at trial. Only after providing a "nightmarish" description of the murders and asking the prospective jurors to assume that Taylor was "a thousand percent guilty" did defense counsel question them on what they believed Taylor's punishment should be.
 A. Prospective Juror Nance
The record shows that the following colloquy occurred during voir dire examination of the panel of prospective jurors of which prospective juror Mr. Nance was a member:
 "[COUNSEL FOR TAYLOR]: Let me go a little farther now and I'm going to get into the particular facts of this case. . . . The evidence in this case is going to be that Mr. and Mrs. Moore were killed. We anticipate the State of Alabama will introduce photographs in this case of the victims. Gruesome photographs. Going to be gory. Going to be bloody. They're going to be something like you might see in a horror movie. They're going to be as gory and gruesome and awful as you've ever seen in your life. The kind of photographs that might give some people nightmares.
". . . .
 "Okay. Let me tell you, ladies and gentlemen, what I think the facts are. I'm going to tell you what the facts are going to be in this case. The facts in this case are going to be, Mr. and Mrs. Moore, who lived up on the mountain, are a fine, old retired couple. Outstanding people. Got a fine son. Salt of the earth kind of people. They deserved to live their life, be left alone. They did not deserve what happened to them in any way whatsoever.
 "On the other hand, we expect the evidence to show you that Michael Taylor is from a very good family. His mother and daddy are some of the finest people that have ever been in this county. His mother is the church secretary in the church they attend. Very devout, religious woman. They raised their son as well as they know how.
 "Until this happened, Michael Taylor was just a normal, average kid. He played church basketball. He played basketball *Page 78 
for Emma Sansom [High School] where he attended school. He played tennis on the tennis team at Emma Sansom. There will be people who will come who have known him most of his life as friends, school teachers, Sunday school teachers, who will tell you that as far as they know he's never even had a fight in his life, that there is absolutely no history of violence at all in his past, that there's no significant history of any prior criminal activity in his life.
 "But the evidence is going to show you that in November of 1991 Michael Taylor went to the home of Mr. and Mrs. Moore. He knew these people. They had been his friends. He had cut their grass. He had with him a metal bar. And he took that metal bar and he beat them to death. He repeatedly raised his arm and struck them over and over, until Mr. Moore was dead. Mrs. Moore was mortally wounded, but she did not die. She lingered on for several days.
 "The family became concerned and contacted a neighbor and asked that they go check on the Moores. At that point, a neighbor came to the house, found that Mr. Moore was dead, Mrs. Moore was still alive. She was taken to a local hospital where she died some several days later. The deaths are horrible. They're cruel. They're inexcusable.
And there's nothing I'm going to say to you through the course of this trial that's going to try to justify what happened.
 "Ladies and gentlemen, having heard the information that I have given to you, I want you to assume now for these questions — I want you to assume that all I told you is true and all that I told you will be introduced into evidence in this case. I'd like to ask you, based on that information, are there any of you on the jury now who will say that, well, if that's the evidence, then the only alternative for me as a punishment is death in the electric chair?
". . . .
 "[COUNSEL FOR TAYLOR]: Ladies and gentlemen, assume all the facts that I've just given you. Also assume that in the sentencing phase of this case there will be evidence introduced in what we call mitigation. There will be evidence that at the time of this crime, Michael Taylor was approximately nineteen years of age, that he has no prior significant history of criminal activity, that he has absolutely no prior history of any kind of violence, that he's from a very good family. As I told you, all that will be introduced into evidence in this case as mitigation.
 "My question to you is, of all you on the jury here, can you tell me now that regardless of the mitigation information that I've just mentioned to you, that you already know now in your mind the only punishment that you think would be proper would be that Michael be sentenced to death in the electric chair?
". . . .
 "[COUNSEL FOR TAYLOR]: Mr. Nance, I'm going to ask you the same question. Could you even consider the mitigation evidence or the lack of prior criminal history, the age, the good family, no prior acts of violence? Could you even consider those as mitigation or is your mind made up that death is the only solution?
 "[MR. NANCE]: No, sir. My mind is not made up until I hear all the testimony that's to be presented to us, but —
 "[COUNSEL FOR TAYLOR]: I'm asking you for the purposes of these questions, now, that that's all the evidence that's going to be. I want you to assume that he's guilty beyond any doubt at all.
"[MR. NANCE]: If it's a hundred percent?
"[COUNSEL FOR TAYLOR]: It's a thousand percent.
 "[MR. NANCE]: It's a thousand percent that he's guilty?
 "[COUNSEL FOR TAYLOR]: I'm telling you that as his lawyer, he is.
 "[MR. NANCE]: I don't see to put him in jail and keep him the rest of his life.
 "[COUNSEL FOR TAYLOR]: What you're saying is that your only vote could be — your only recommendation to the judge would be death?
"[MR. NANCE]: Be death. *Page 79 
 "[COUNSEL FOR TAYLOR]: And you feel like you just could not consider his age? In other words, the factors of his age and lack of prior criminal activity and the good family, you just couldn't put any weight on those?
"[MR. NANCE]: No, sir, I couldn't.
 "[COUNSEL FOR TAYLOR]: Okay. Well, again, I — that's what we're trying to do, is find out if you —
 "[MR. NANCE]: I say, best of his interest, if he was put to death at his age, put in prison for the rest of his life, because there's no life in prison. So, for the benefit of the taxpayers and his, I'd say death.
". . . .
 "[PROSECUTOR]: Some of you have indicated to Mac, now, that based on what he said he thinks the evidence is going to show that you wouldn't consider mitigating. You told me earlier you would, at least, look at it. I don't — I'm not asking you how much weight you'll give it. I'm just asking you whether or not you'll do what the law requires you to do and you'll at least consider it. That's all you've got to do, is consider it.
". . . .
 "[PROSECUTOR]: Now, Mr. Nance, will you consider it?
 "[MR. NANCE]: Yes, sir, I'll consider it and weigh it out. But like I said —
". . . .
 "[PROSECUTOR]: The only thing I'm asking, if the judge charges you that if that evidence is presented, you've got to consider it. Now, you might give it a lot of weight, you might give it a little weight, you might give it no weight, but at least will you look at it and consider it?
"[MR. NANCE]: Yes, sir.
". . . .
 "[COUNSEL FOR TAYLOR]: I guess, Mr. Nance, the same thing again. The judge is going to tell you about mitigation and aggravating, but if in your mind you've already said to yourself, 'Hey, I don't care what he says, those things don't mean anything to me, I'm not going to give them any weight. I'm not even going to consider them.' If that —
 "[MR. NANCE]: You said when you was up at the stand before that he's a thousand percent guilty.
 "[COUNSEL FOR TAYLOR]: Yes, sir, he is. We're talking about what we're going to do with him. In other words, we've got him convicted —
 "[MR. NANCE]: I've done weighed it out, because you've said he was a thousand percent guilty. I have done weighed it out. I have done thought about it.
"[COUNSEL FOR TAYLOR]: Okay.
"[MR. NANCE]: And I said death penalty.
 "[COUNSEL FOR TAYLOR]: Well, is that still your answer? When [the prosecutor] was up there you seemed to say to him, well, I'll consider this other stuff —
 "[MR. NANCE]: I have considered it when you said he was a thousand percent guilty.
 "[COUNSEL FOR TAYLOR]: So, you're saying you have considered it and your answer now is death is the only alternative for you?
"[MR. NANCE]: I'd say yes."
 B. Prospective Jurors Maise and C. Lasseter
Before questioning prospective jurors Maise and C. Lasseter, Taylor's defense counsel also described in great detail the evidence that he expected to be presented at trial. Thereafter, the following colloquy occurred involving Maise and C. Lasseter:
 "[COUNSEL FOR TAYLOR]: You would consider the mitigating? You don't have a fixed opinion at this point?
". . . .
"[COUNSEL FOR TAYLOR]: Mr. Maise?
 "[MR. MAISE]: You're asking me to make a judgment now or asking all of us to make a judgment now, and I'd just have to be honest with you and tell you that I don't think his age nor his background would have any bearing on the fact that I think he's guilty and worthy of the death penalty. *Page 80 
 "[COUNSEL FOR TAYLOR]: I guess, Mr. [C.] Lasseter, what would your answer be at this point to this question — to this issue?
"[Mr. C. LASSETER]: I'd say death penalty.
 "[COUNSEL FOR TAYLOR]: Would it — Could you consider or put any weight in his age or no significant criminal history or no prior felony acts of violence against anyone before this happened? Would that — Would that change your mind?
 "[MR. C. LASSETER]: If there was enough something there to prove something, there would be a bearing, but if not —
 "[COUNSEL FOR TAYLOR]: Can you tell me what you mean, if there's enough there to prove. Those mitigation or what did you mean by —
 "[MR. C. LASSETER]: Well, I mean, you know, you hear all the time 'Kids nowadays' and I'm saying, when I was nineteen I was already working. They don't have nothing to do. You know, it's a lot of things. From what I've heard so far, well, I would still go with the death penalty. I mean, age, good family or not. I mean —
"[COUNSEL FOR TAYLOR]: Okay.
". . . .
 "[PROSECUTOR]: You might not put any stock in it, but would you consider his age and consider any prior criminal history or lack of it he had, even if you don't — Like I mentioned earlier, you decide how much weight you give to it. You might not put any to it, but would you at least consider it?
". . . .
 "[PROSECUTOR]: You, Mr. [C.] Lasseter, would you consider it even if you gave it no weight at all?
"[MR. C. LASSETER]: No weight at all?
 "[PROSECUTOR]: You might decide, yeah, I'll consider it but I'm not going to count it for anything. All I want to know is, will you consider it?
"[MR. C. LASSETER]: I would consider it.
". . . .
 "[PROSECUTOR]: Mr. Maise, would you look at it, even if you gave it no weight?
"[MR. MAISE]: His age?
"[PROSECUTOR]: Yes.
 "[MR. MAISE]: It's already been revealed and I've already considered it.
". . . .
 "[COUNSEL FOR TAYLOR]: When [the prosecutor] said on his turn if you would consider it even though you gave it no weight at all, what was your answer? Who did he talk to —
 "[MR. C. LASSETER]: Me. I said I would consider it.
 "[COUNSEL FOR TAYLOR]: Was the question to you even though you gave it no weight at all and you said, yes, I'd consider it, is that the question he asked you?
 "[MR. C. LASSETER]: He asked me would I consider it, whether I gave it no weight at all.
 "[COUNSEL FOR TAYLOR]: What did you mean by that answer?
"[MR. C. LASSETER]: That I would consider it.
". . . .
 "[COUNSEL FOR TAYLOR]: Mr. [C.] Lasseter, would that change what you told me earlier, that you still believe that Michael Taylor would deserve the death penalty?
"[MR. C. LASSETER]: Considering the weight?
 "[COUNSEL FOR TAYLOR]: Considering the age. Considering the age, would that change your opinion that even considering the age you would vote rather — you know, that you would vote for the death penalty? Your individual vote.
 "[MR. C. LASSETER]: I would probably still vote for the death penalty.
". . . .
 "[COUNSEL FOR TAYLOR]: Let me ask — I guess, let me ask if Mr. [C.] Lasseter, if you would ever consider voting for life without parole in any capital case? *Page 81 
"[MR. C. LASSETER]: Depending on the circumstances. I mean, I — That's like asking if it's going to rain tomorrow. I don't know. I can't tell you that without knowing some kind of evidence or background or something about what's going to happen.
 "[COUNSEL FOR TAYLOR]: Your Honor, I don't have any more questions."
 C.
Under Alabama's capital murder sentencing statute, the jury is required to weigh both the aggravating and the mitigating factors that have been proved during the penalty phase of the trial. The weighing of these factors is "a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death." Ala. Code 1975, §13A-5-48. The possible aggravating factors are limited to those listed in § 13A-5-49. Mitigating factors are listed in §13A-5-51, but that list is not exclusive. A juror is not required to give a set weight to any particular factor, and one aggravating factor may outweigh several mitigating factors and vice versa. See Magwood v. State, 548 So.2d 512
(Ala.Crim.App.), affirmed, 548 So.2d 516 (Ala. 1988), cert. denied,493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989). However, a juror may not arbitrarily ignore any applicable mitigating or aggravating factor. See Whisenhant v. State, 482 So.2d 1225
(Ala.Crim.App. 1982), affirmed in part and remanded,482 So.2d 1241 (Ala. 1985).
We must first decide whether juror Nance, juror Maise, or juror C. Lasseter was so biased in favor of the death penalty that he could not impartially perform the duties of a juror in rendering an advisory sentence, as described above. As to this issue, the Court of Criminal Appeals concluded:
 "Our review of the record convinces us that veniremembers Maise, [C.] Lasseter, and Nance would not automatically impose the death penalty in every capital case, and that their indication that they would impose it in this case was based on the facts provided by defense counsel on voir dire. In effect, these veniremembers were stating that they would consider any mitigating factors but based upon the facts provided by counsel on voir dire examination they would recommend death if they had to make a decision at that time."
Taylor, 666 So.2d at 47 (emphasis original).
We agree with that conclusion. Taylor's counsel provided each panel of prospective jurors with an exhaustive description of the murders, describing photographs they would be shown of the murder scene as "gory," "bloody," and "gruesome." Defense counsel then described Taylor and his family background. Instructing the prospective jurors to assume that the facts just provided to them were true and that Taylor was guilty of the murders, his counsel then asked them whether they would consider the mitigating factors of Taylor's youth and lack of prior criminal history in determining their recommended punishment. Each of the prospective jurors that Taylor argues should have been struck for cause repeatedly stated that he would consider the mitigating evidence. What Taylor now takes issue with is that the three went further and stated that, based on the facts Taylor's counsel had instructed them to assume were true, they had considered the mitigating factors and, given the nature of the murders, had accorded the mitigating factors little or no weight and believed death to be the appropriate sentence.
We believe Taylor's counsel went a step beyond questioning whether prospective jurors Nance, Maise, and C. Lasseter would automatically vote for the death penalty in every case, as was recognized in Morgan as one of a defendant's due process rights. In effect, defense counsel forced prospective jurors to make an immediate decision on Taylor's sentencing based solely on the facts presented during voir dire. We find it quite telling that upon continued questioning by defense counsel, prospective juror Maise stated, "You're asking me to make a judgment now or asking all of us to make a judgment now." (Emphasis added.) *Page 82 
Thus, rather than simply attempting to identify those jurors who were not impartial and who would vote for the death penalty in every case regardless of the facts, Taylor's counsel sought to identify any prospective juror who would vote for deathunder the facts of this particular case and then to eliminate that prospective juror by using strikes for cause. The due process protections recognized in Morgan do not extend that far. Accordingly, we conclude that Nance, Maise, and C. Lasseter were impartial prospective jurors who would not
automatically vote for the death penalty in every case. The trial court did not err in refusing to strike them for cause on that basis.
Taylor also asserts another basis for arguing that prospective juror Nance should have been struck for cause. Taylor claims that on voir dire Nance revealed that he viewed Taylor's young age as a aggravating factor rather than as a mitigating factor, in direct violation of Ala. Code 1975, §13A-5-51(7).
It is true that prospective juror Nance stated during voir dire that he believed there was no life to be lived in prison and that it would be in Taylor's best interest for him to be sentenced to death rather than to spend the rest of a natural life in prison. However, " 'the test to be applied is whether the juror can set aside [his or] her opinions and try the case fairly and impartially, according to the law and evidence.' "Hunter v. State, 585 So.2d 220, 222 (Ala.Crim.App. 1991), quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). Moreover, the statement cannot be viewed in isolation; in reviewing a trial court's decision on a challenge for cause, this Court must review the voir dire questions and answers as a whole. Morrison v. State, 601 So.2d 165 (Ala.Crim.App. 1992);Hunter, supra.
"The qualification of prospective jurors rests within the sound discretion of the trial judge." Morrison, 601 So.2d at 168. A trial judge's ruling on a challenge for cause is accorded great weight and will not be disturbed on appeal unless it is clearly erroneous and represents an abuse of discretion. Morrison, supra; Hunter, supra. After examining the entire record of the voir dire as it involved prospective juror Nance, we conclude that the trial judge did not abuse his discretion in refusing to strike Nance for cause. As a whole, the record reflects that Nance indicated he was willing to follow the law and the instructions given to him by the trial judge. Accordingly, there was no reversible error in the trial judge's refusal to strike prospective juror Nance for cause.
 II. The Reasonable Doubt Standard A.
Taylor argues that his conviction should be reversed because, he says, both the prosecutor and the trial judge improperly defined "reasonable doubt" to the jurors when they described the State's burden of proof. He argues that it was improper for the prosecutor to tell the jury that for a juror to have a reasonable doubt, the reason attached to the juror's doubt must be a "good" reason. He also argues that the prosecutor improperly told the jury that it was the State's burden to prove Taylor guilty to a "moral certainty," and that, in essence, that instruction had the same effect as if the prosecutor had told the jurors to follow their individual moral codes rather than the law. In sum, Taylor argues that the trial court committed reversible error by not curing statements made by the prosecutor regarding reasonable doubt that Taylor says were improper and committed further reversible error by repeating a definition of "reasonable doubt" that Taylor claims violated the holding of Cage v. Louisiana, 498 U.S. 39,111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
In response, the State first argues that the prosecutor's comments regarding reasonable doubt were not improper. The State also argues that the trial court properly instructed the jury on the State's burden of proof and on the meaning of "reasonable doubt" and that its instruction did not include any of the improper language condemned by the United States Supreme Court in Cage.
 B.
Taylor correctly asserts that while explaining the State's burden of proof to each of the panels of prospective jurors, the prosecutor *Page 83 
said that reasonable doubt is a doubt for which one can give a good reason. For example, he told one of the panels:
 "Now instead of going through that little balancing test in a civil case, the criminal case, though, the standard is beyond a reasonable doubt. What that reasonable doubt means and, of course, the judge will go into it in greater detail in his charge, but just to give you kind of a quick overview of it, it is a doubt for which you could give a good reason.
 "It's a doubt and a reasonable doubt that arises out of the evidence in the case or that arises out of a lack of evidence in a case or that arises because of the insufficient status of the evidence in a case. That's not a mere guess or groundless surmise or a whim. It is a reasonable doubt."
(Emphasis added.) Taylor did not object to these statements, or to any others regarding the meaning of "reasonable doubt" that were made to prospective jurors during voir dire.
The prosecutor also further defined the State's burden of proof to the jury during closing arguments in the guilt phase of the trial:
 "Most of you might think that you know what it means because you've heard it so much, but if each one of you were to be handed a pencil and a piece of paper and ask [sic] you to sit down and write a definition of those two phrases, 'beyond a reasonable doubt' and 'to a moral certainty,' could you do it?
 "Let's stop and look at it just a second since you don't have pencil and paper, and go through it. What I think the judge is going to charge you as to what the people's burden of proof is in this case, and let's take phrase one, 'beyond a reasonable doubt.' I think Judge Rhea will tell you that in looking at that definition or that phrase, if you will stop and consider it just a minute, it means exactly what it says. The defendant must be proven [guilty] beyond a doubt for which you can give a good reason.
 "Now, that reason is not some mere whim. It's not groundless surmise. It's not a guess. . . .
 "A doubt itself for which you can give a good reason is a doubt that has got to either arise out of the evidence, out of the unsatisfactory nature of the evidence, or out of a lack of evidence. And unless it gets to that point, then it does not meet the standard of being a reasonable doubt. Let's be sure that you understand that it's got to be a doubt for which you can give some good reason . . . based on what has come out of this witness box and these exhibits. And unless it rises to that level, then it's not a reasonable doubt and the people, then, are entitled to a verdict of guilty at your hands.
 "Now the phrase 'to a moral certainty' deals a little bit with the way we live our lives. . . .
". . . .
 "Since we do not live our lives by mathematical standards, our system of justice does not require the people to prove somebody guilty beyond a mathematical proof, because that would require the people to prove somebody guilty on a standard higher than the way we, ourselves live. We live by a moral code, and that moral code is something that is instilled in us and nurtured in us.
". . . .
 "Put another way, too, that phrase 'to a moral certainty' means to the exclusion of all reasonable doubt based on the moral code that we live by, so both of the phrases, then, end up kind of coming full circle back to each other. That's the burden of proof people have to meet in a criminal case. . . ."
(Emphasis added.) Taylor also failed to object to these statements.
We note that following the attorneys' closing arguments, but before charging the jury on the law, the trial judge clearly instructed the jury that statements made by the attorneys were not evidence or law and that any such statements should be disregarded if they were "not supported by the evidence or by the law as given to you by the court." The trial judge then proceeded to charge the jury on the law, including an instruction on the State's burden of proof. The portions of *Page 84 
that jury instruction most relevant to Taylor's claim of error are as follows:
 "The term reasonable doubt means some doubt which has some good reason for it arising out of the evidence or a part of the evidence or a lack of evidence in the case. It does not mean a doubt which arises from some mere whim or from some groundless surmise or guesswork on your part.
 "Now, . . . while it's rarely possible to prove anything to an absolute certainty, a defendant is not to be convicted on mere suspicion, conjecture or surmise. The law requires you to be satisfied of the defendant's guilt beyond a reasonable doubt, but the law at the same time prohibits you from going outside the evidence to hunt up doubts upon which to acquit the defendant.
 "As I've told you, a reasonable doubt may arise not only from the evidence produced, but it may also arise from a part of the evidence or lack of evidence in the case.
". . . .
 "Stated another way, ladies and gentlemen, a reasonable doubt exists in a case when after careful and impartial consideration of all the evidence in the case the jurors do not feel convinced to a moral certainty that the defendant is guilty.
 "Now, I've given you a term 'reasonable doubt,' and I want to tell you a little bit about moral certainty. Oftentimes, ladies and gentlemen, you will hear an explanation of the State's burden of proof in a criminal case. The State has the burden of proving a defendant guilty beyond a reasonable doubt. At times you'll hear it stated the burden is to prove the defendant guilty to a moral certainty. Sometimes you'll hear it stated that it's to prove the defendant guilty beyond a reasonable doubt and to a moral certainty.
 "These terms mean the same thing and just because one is used in place of another or they may be used together does not add anything or take away anything from it.
". . . .
 "The court charges the jury that the burden is on the State and it is the duty of the State to show beyond all reasonable doubt and to the exclusion of every other reasonable hypothesis every circumstance necessary to show that the defendant is guilty, and unless the State has done that in this case it is your duty, ladies and gentlemen of the jury, to render a verdict of not guilty.
 "The court charges the jury that the burden is never on the defendant to establish his innocence or to disprove the facts in this case. If any or all of the evidence . . . raises in the minds of the jury a reasonable doubt as to the guilt of the defendant, they should acquit him.
 "The court charges the jury that the defendant is presumed to be innocent until the evidence convinces the jury beyond all reasonable doubt that he is guilty. And if upon all — consideration of all the evidence the jury has a reasonable doubt growing out of all the evidence they must acquit him."
(Emphasis added.)
As noted previously, Taylor failed to object during trial to any of the prosecutor's statements regarding the meaning of "reasonable doubt." He also failed to make a sufficient objection to the trial judge's jury instruction. Defense counsel objected only on the basis that the trial court's jury charges had not come from an approved book of charges. Defense counsel made no specific objection to the reasonable doubt charge, and counsel's general objection was insufficient to preserve for review the alleged error now complained of.Reuther v. City of Leeds, 599 So.2d 1246 (Ala.Crim.App. 1992);Hagood v. State, 588 So.2d 526 (Ala.Crim.App.), cert. denied,Martin v. Alabama, 504 U.S. 911, 112 S.Ct. 1943,118 L.Ed.2d 548 (1992). Thus, Taylor has raised this issue for the firsttime on appeal; therefore, it can be reviewed only under the"plain error" rule. Rule 39(k), Ala.R.App.P. Plain error is error that "has or probably has adversely affected the substantial rights of the petitioner." Id. "In other words, the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice *Page 85 
would otherwise result.' " United States v. Young, 470 U.S. 1,15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting UnitedStates v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584,1592, n. 14, 71 L.Ed.2d 816 (1982).
 C.
In Cage, the United States Supreme Court condemned a jury instruction in a first-degree murder trial that equated reasonable doubt with "such doubt as would give rise to a graveuncertainty," an "actual substantial doubt," and a doubt believed to a "moral certainty." 498 U.S. at 40,111 S.Ct. at 329 (emphasis original). The Supreme Court held:
 "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."
498 U.S. at 41, 111 S.Ct. at 329 (emphasis added).
In this case, neither the prosecutor nor the trial judge used the term "actual substantial doubt" or "grave uncertainty" in explaining the reasonable doubt standard. The use of those terms by the trial court in Cage was the major flaw in that court's jury charge. See Gaskins v. McKellar, 500 U.S. 961,111 S.Ct. 2277, 114 L.Ed.2d 728 (1991) (Justice Stevens, concurring specially). Thus, the prosecutor's comments and the trial judge's jury charge in this case are clearly distinguishable from the charge that was condemned in Cage. Even though the prosecutor and the trial judge equated the term "beyond a reasonable doubt" with "to a moral certainty" — terms this Court has previously noted are not exactly synonymous, Ex parteMcWilliams, 640 So.2d 1015 (Ala. 1993) — we conclude that neither the prosecutor's comments nor the jury charge violatesCage and that they do not suggest a finding of guilt based on a burden of proof lower than that required by constitutional due process protections.
This Court has previously reviewed similar jury instructions regarding the meaning of "reasonable doubt," without finding reversible error. See Ex parte McWilliams, supra; Ex parteAdkins, 600 So.2d 1067 (Ala. 1992); Ex parte Beavers,598 So.2d 1320 (Ala. 1992). Moreover, the United States Supreme Court recently noted that although it does not condone the use of the words "moral certainty" in a jury charge, it found no reversible error in the trial judge's use of that phrase.Victor v. Nebraska, ___ U.S. ___, 114 S.Ct. 1239,127 L.Ed.2d 583 (1994). It is clear that neither the prosecutor's comments nor the trial court's jury charge in this case was plain error.
 III. The Jury's Role in Sentencing A.
Taylor contends that his death sentence should be vacated because, he says, the prosecutor and the trial judge made statements to the jury that undermined the importance of its role in sentencing, in violation of Caldwell v. Mississippi,472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). He argues that the prosecutor made improper statements to each group of prospective jurors during voir dire and to the jury during the penalty phase of trial. Taylor argues that the trial judge committed reversible error when, Taylor claims, he failed to instruct the jurors on the crucial importance of their role in sentencing.
The State responds by arguing that Taylor's objection on this issue, which was made by motion in limine before closing arguments in the penalty phase, and which was overruled by the trial judge, did not preserve for review any error relating to comments made before that point in the trial (such as errors made during voir dire or during the opening remarks of the penalty phase) and, thus, that this Court must review Taylor's argument primarily via the plain error standard. The State further contends that the prosecutor's comments and the judge's instruction regarding the jury's role in sentencing were correct statements of Alabama law. Thus, the State *Page 86 
argues that the statements were not error, plain or otherwise.
 B.
Taylor is correct in saving that during voir dire the prosecutor repeatedly told each panel of prospective jurors that the jury's verdict on sentencing was only a recommendation and that the ultimate decision belonged to the trial judge. Taylor did not object to any of those statements. The prosecutor also made similar statements to the jury in opening remarks at the penalty phase of the trial:
 "[PROSECUTOR]: May it please the Court, . . . ladies and gentlemen, as the judge has told you, we have now reached the second phase as is required by the capital statutes of our State law, what is known as the sentencing phase.
 "There's going to be some evidence now presented to you for your consideration to assist you when you get ready to retire and deliberate on this matter as far as what type of recommendation that you're going to make to the judge.
 "Again, let me, please, make sure you understand it's a recommendation. Don't want anybody getting up here giving you the idea that you're sending someone to their death, that you're killing anybody. You're not. Don't let anybody try to put a guilt trip on you or anything like that.
 "The function of the jury in this particular phase of the trial is to listen to the evidence, go through then the weighing of aggravating and mitigating circumstances as the evidence proves those to you and then provide some assistance to the judge by means of what is known as an advisory verdict.
 "The ultimate decision that's got to be made in this case is Judge Rhea's. You're kind of sitting here as his council of advisors. By the verdict that will return at the conclusion of this phase of the trial, based on the verdict that you would bring back to him in accordance with the law and the evidence as you hear it, he will take your advice under consideration in ultimately making the decision that has to be made.
 "So, please, don't personally feel like that you're making a decision on someone's life, that the decision is strictly yours or allow somebody to put some kind of guilt trip on you that you're doing something. You're sitting here merely as an advisor to the court. The decision is ultimately the judge's."
(Emphasis added). In its opinion in this case, the Court of Criminal Appeals condemned the statement of the prosecutor that is emphasized immediately above. Taylor, 666 So.2d at 49. However, Taylor's defense counsel did not object to it.
As noted previously, defense counsel filed a motion in limine just before closing arguments in the penalty phase of trial, seeking to prevent the prosecution from "reminding [the jury] over and over again that their verdict is a recommendation only," because, counsel said, such comments would "reduce their importance of being jurors in this phase as far as recommending a sentence." The trial judge denied the defense motion. Thereafter, in his first remarks to the jury during closing arguments, the prosecutor emphasized the importance of the jury's role in the sentencing process:
 "[PROSECUTOR]: May it please the court, . . ., ladies and gentlemen, we've come to that particular point now in the second phase of this trial, getting ready to go make a very important decision. It's an important decision that is going to affect the folks in this county. It's going to affect Mr. and Mrs. Moore's family. Going to affect the defendant's family. It's not an easy task that you're fixing to undertake.
 "I don't envy you at all and I sure wouldn't want to swap places with any of you."
Defense counsel then made his final argument to the jury regarding sentencing and concluded by saying that if it recommended that Taylor be sentenced to death, then it would also be sentencing Taylor's mother to death:
 "[COUNSEL FOR TAYLOR]: I submit to you that he deserves to be punished. There's no question that he does. But he deserves a life-without-parole sentence. If you kill Michael, you'll kill two people. *Page 87 You'll kill Michael and you'll kill his mother. I submit to you that . . . you should not . . . recommend the death penalty in this case. Thank you."
(Emphasis added.) That comment was immediately referred to by the prosecutor in his rebuttal argument:
 "[PROSECUTOR]: Ladies and gentlemen, you're not going to kill anybody. Nobody is asking you to do that. Nobody is walking up and saying 'Here's the switch, pull it.' Nothing like that.
 "What you're being asked to do is sit here in an advisory capacity and based on your many years of combined experience, your lives, your experience, you're asked to sit here and weigh things in the balance, the evidence as you've heard it, and to make a recommendation to Judge Rhea of what you feel like is an appropriate sentence.
 "The judge himself is going to have to sit down and weigh this evidence just as you've already had to do in the trial, in the guilt phase, and just as you'll go back and weigh it again now. He's going to have to determine the aggravating and mitigating circumstances that he finds and he's going to have to go through the same weighing process. He's going to have to take all of that into consideration with a pre-sentence report that will be done by another agency. And with your guidance and your counsel that you're going to give him by the advisory verdict that you bring — And it's important.
 "It's very important, because it will give this judge some guidance and some assistance in what is appropriate for this type of offense, especially when it comes from law-abiding citizens such as you. It carries some weight and it does matter."
(Emphasis added). This statement just quoted regarding the jury's role in sentencing is the only statement made by the prosecutor on that subject that followed Taylor's objection by motion in limine regarding that subject.
 Finally, Taylor argues that the trial judge committed reversible error in his instructions to the jury regarding its proper role in sentencing. During his instructions to the jury, the trial judge repeatedly stated that the jury would "recommend the defendant's punishment" and that it would "recommend a sentence." Taylor's counsel did not object to these instructions.
 C.
We must determine whether the statement of the prosecutor and the trial judge indicating to the jury that it would only render "an advisory verdict" or "a recommended sentence" require Taylor's death sentence to be vacated. Taylor claims that the statements misled the jury as to the importance of its role in sentencing, in violation of Caldwell v. Mississippi,472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). InCaldwell, the United States Supreme Court stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29,105 S.Ct. at 2639-40.
Because Taylor failed to object to the prosecutor's remarks, made during voir dire and during his opening statement at the penalty phase of trial, and to the trial judge's instructions, we review those statements under the plain error standard. Rule 39(k), Ala.R.App.P. First, we find no conflict between the prosecutor's statements and the trial judge's instructions regarding the jury's role in sentencing (as that of offering only a recommended or advisory verdict) and Alabama law — that is the jury's role under Alabama's unique capital sentencing scheme. Under Ala. Code 1975, § 13A-5-46, the jury's role in sentencing in a capital case is to render an advisory verdict recommending a sentence to the trial judge. It is the trial judge who ultimately decides the capital defendant's sentence, and, "[w]hile the jury's recommendation concerning sentence shall be given consideration, it is not binding upon thecourts." § 13A-5-47 (emphasis added).
Even though we find no error with regard to the prosecutor's statements regarding the jury's role in sentencing, we note *Page 88 
that the trial judge correctly instructed the jury that statements made by the attorneys were not evidence and were not law and that those statements should be disregarded if they were "not supported by the evidence or by the law as given to you by the court." We also find no error in the trial judge's instructions to the jury on its role in sentencing. It is well established that "the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was 'advisory' and a 'recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell." Martin v. State, 548 So.2d 488, 494
(Ala.Crim.App.), affirmed, 548 So.2d 496 (Ala. 1988), cert.denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See White v. State, 587 So.2d 1218 (Ala.Crim.App. 1990),affirmed, 587 So.2d 1236 (Ala. 1991); cert. denied,502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992); Kuenzel v. State,577 So.2d 474 (Ala.Crim.App. 1990), affirmed, 577 So.2d 531
(Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991). In sum, we find no error, plain or otherwise, in the comments of the prosecutor, or in those of the trial judge, regarding the jury's role in sentencing in a capital murder trial.
Although Taylor does not argue that Alabama's capital sentencing scheme is unconstitutional, we note that this issue was recently addressed by the United States Supreme Court inHarris v. Alabama, ___ U.S. ___, 115 S.Ct. 1031,130 L.Ed.2d 1004 (1995). In Harris, the petitioner sought a mandate from the Supreme Court stating that the United States Constitution requires Alabama trial judges to give "great weight" to the jury's advisory verdict. However, the Supreme Court ruled that Alabama's death penalty sentencing scheme, which does not prescribe the weight the trial judge is to give the jury's verdict, is not unconstitutional. The Court stated: "The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." ___ U.S. at ___, 115 S.Ct. at 1037.
Finally, we must review the final comments the prosecutor made to the jury during the penalty phase of the trial, in which he told the jurors they were "not going to kill anybody." Taylor claims that the prosecutor's comment misled the jurors regarding the importance of their responsibility in rendering an advisory verdict. This statement by the prosecutor was the only one to which Taylor's objection by motion in limine, made before closing arguments, would apply. We conclude, however, that the prosecutor's comment was a fair response to defense counsel's statement made immediately before, by which defense counsel argued to the jury that a recommendation of death would kill both Michael Taylor and his mother. "[A] prosecutor has the right to 'reply in kind' to statements made by defense counsel in the defense's closing argument." Ex parte Musgrove,638 So.2d 1360, 1369 (Ala. 1993), cert. denied, Rogers v.Alabama, ___ U.S. ___, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). The prosecutor's remark was not reversible error.
 IV. Conclusion
As noted previously, this Court has reviewed the record and the briefs, has considered the arguments made before the Court on oral argument, and has examined the determinations of the Court of Criminal Appeals in relation to all of the issues raised by Taylor. This Court has also thoroughly examined the record for plain error, but has found none. We conclude that the Court of Criminals Appeals committed no error in affirming Taylor's convictions and sentence. Moreover, we find that the record contains overwhelming evidence of Taylor's guilt. The judgment of the Court of Criminal Appeals affirming the defendant's convictions and death sentence is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON, and COOK, JJ., concur.
[1] The Supreme Court further explained that standard by stating that "the belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." (Citation omitted: emphasis added.) Morgan, 504 U.S. at 735,112 S.Ct. at 2233. *Page 89