972 So.2d 737 (2007)
Ex parte James Earl WALKER.
(In re James Earl Walker
v.
State of Alabama).
1041931.
Supreme Court of Alabama.
March 30, 2007.[*]
Rehearing Denied May 18, 2007.
*740 Charles Decker, Dothan, for petitioner.
Troy King, atty. gen., and. Michael Nunnelley, asst. atty. gen., for respondent.
STUART, Justice.
James Earl Walker was convicted of murder made capital because the murder was committed during the course of a first-degree burglary. See § 13A-5-40(a)(4), Ala.Code 1975. After a jury, by a vote of 12-0, recommended that Walker be sentenced to death, the trial court conducted its independent sentencing hearing, made specific findings of fact, and sentenced Walker to death.
The Court of Criminal Appeals affirmed Walker's conviction but remanded the case for the trial court to correct various deficiencies in its sentencing order. Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004), On return to remand, the Court of Criminal Appeals affirmed Walker's sentence of death. 932 So.2d at 160.
This Court granted certiorari review as to certain issues raised in Walker's petition concerning both the guilt phase and the sentencing phase of Walker's trial. We affirm.

Facts
The Court of Criminal Appeals provided a thorough recitation of the facts from the trial court's sentencing order, 932 So.2d at 145-46; therefore, we will provide only a summary of the evidence relevant to the issues before us.
The evidence tended to establish the following. In January 2000, Bessie Lee Thweatt, who was 87 years old, suffered multiple blunt-force injuries to her head, before she was fatally shot, at close range, in the head. The testimony indicated that Thweatt was alive during the infliction of the blunt-force-trauma injuries and that she suffered great pain before dying from the gunshot wound. Thweatt's body was found in her Houston County home, which had been ransacked.
Law-enforcement officers from the Houston County Sheriff's Department suspected Walker and Rex Allen Beckworth, residents of Etowah County, of the murder. Walker was arrested in Etowah County by Etowah County law-enforcement officers. During questioning in Etowah County by Houston County law-enforcement officers, Walker admitted to being outside Thweatt's house at the time of her murder. While Walker was being transported to Houston County from Etowah County, law-enforcement officers stopped at Thweatt's residence, and Walker gave a statement, which was videotaped, describing his version of the events on the night Thweatt was killed. According to Walker, he never entered Thweatt's house, and he ran from the area when he heard a gunshot.

*741 Discussion

We will address only the grounds raised in Walker's petition upon which certiorari review was granted. We note that in his brief to this Court, Walker expands the grounds to include additional grounds as to which we did not grant certiorari review. We will address those additional grounds only if we notice plain error.

A. Alleged violation of Batson v. Kentucky.
First, Walker contends that the trial court erred in concluding that he did not present a prima facie case of a violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and, consequently, in not requiring the State to provide race-neutral and gender-neutral reasons for its peremptory strikes. According to Walker, the trial court based its refusal to find a prima facie case of a Batson violation on the facts that Walker was a white male and three African-American females were seated on the jury.
The record reveals that the following occurred after the jury was selected:
"[Walker's counsel]: By my count, after jurors were taken off for cause, there was fifteen African-American members of the strike panel. The State has used the right of peremptory challenge to remove ten. We contend that [to be] a violation of the principles enunciated by the United States Supreme Court in Batson v. Kentucky and the Alabama Supreme Court in Ex parte Branch [, 526 So.2d 609 (Ala.1987),] and Ex parte Thomas [, 659 So.2d 3 (Ala.1994),] and other cases of similar import.
"THE COURT: Do you have any evidence you want to present in that regard?
"[Walker's counsel]: Nothing beyond the numerical disparity, Your Honor. "THE COURT: Let the record reflect that the defendant is a white male and that there are three African[-American] females on the jury. Any response from the State?
"[Prosecutor]: Judge all they have given you is the numbers. The Defendant is white. He has not come forward with any questionnaires that we didn't ask questions on the ones we struck. We have reasons. Just numbers is not enough. You asked for evidence.
"THE COURT: Do you have anything else?
"[Walker's counsel]: Nothing further.
"THE COURT: Okay. Generally, it has been my practice to make the State go forward. The Defendant, as I said, is a white male and there are three African-American females on this jury. The Court finds that the Defendant has failed to prove a prima facie case."
This Court has stated:
"The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider `all relevant circumstances' which could lead to an inference of discrimination."
Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). An objection based on numbers alone, however, does not support the finding of a prima face case of discrimination and is not sufficient to shift the burden to the other party to explain its peremptory strikes. Ex parte Trawick, 698 So.2d 162 (Ala.1997).
Here, the trial court did not err in holding that Walker did not present a prima facie case of discriminatory use of peremptory strikes by the State. Walker's objection was based totally on the number of African-Americans the State struck from the jury. When the trial court asked for facts or evidence to support the objection, Walker was unable to provide any. The trial court properly concluded that Walker *742 had not presented a prima facie case of discriminatory use of peremptory strikes.
Moreover, Walker does not establish a conflict between the trial court's holding that he did not present a prima facie case and the holding of the United States Supreme Court in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In Powers, the United States Supreme Court stated: "A criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." 499 U.S. at 402, 111 S.Ct. 1364. Walker argues that the trial court's statements on the record that Walker was white and that three African-American females were ultimately seated on the jury provides evidence indicating that the trial court based its ruling on an improper ground. We disagree. Our reading of the statements in the context of the record leads us to conclude that the trial court, in light of the fact that Walker offered no evidence to support his objection, was merely trying to establish a few facts in the record to reflect the makeup of the jury. Thus, Walker has not established a conflict between the trial court's ruling and the Supreme Court's holding in Powers.
Lastly, Walker asks this Court to review the record and conclude that plain error occurred because, he says, the record evidences that the State engaged in a discriminatory use of its peremptory strikes. Although he did not object on this basis in the trial court, he now argues that the State" failed to strike prospective male and white jurors for the same reasons it used to strike prospective female and African-American jurors. To support his argument, Walker points out what he says is evidence of disparate treatment of venire-members during the voir dire.
Plain error is
"error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 (Ala.1995). The, plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor."
Ex parte Trawick, 698 So.2d at 167.
Moreover,
"`"[for plain error to exist in, the Batson context, the record must raise an inference that the state [or the defendant] engaged in `purposeful discrimination' in the exercise of its peremptory challenges, See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)."'"
Smith v. State, 756 So.2d 892, 915 (Ala. Crim.App.1998), aff'd, 756 So.2d 957 (Ala. 2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).
We find no plain error in regard to this issue. When the. State exercised its peremptory strikes, it had before it both the jurors' answers to questions on voir dire and their answers to the juror questionnaire as a basis for its peremptory strikes.[1] The questionnaires were not included in the appellate record. See Rule 10(a)(6), Ala. R.App. P. However, pursuant to Rule *743 18.2(b), Ala. R.Crim. P., we requested the circuit court to forward to us the relevant juror questionnaires to allow us to determine if the record supports an inference that the State engaged in purposeful discrimination in its exercise of its peremptory strikes. See Blackmon v. State, [Ms. CR-01-2126, August 25, 2006] ___ So.2d ___, ___ (Ala.Crim.App.2005) (opinion on application for rehearing) (in which the Court of Criminal Appeals requested the circuit clerk, pursuant to Rule 18.2(b), Ala. R.Crim. P., to forward to it juror questionnaires and then conducted a plain-error review of an alleged Batson violation).
We have carefully reviewed the record and the relevant juror questionnaires to determine whether an inference can be drawn that the State engaged in purposeful discrimination against African-Americans and females.[2] There is no inference of purposeful discrimination by the State in its exercise of its peremptory strikes; therefore, no plain error exists in this regard.
B. Alleged improper jury instruction on the balancing of aggravating and mitigating circumstances in determining sentence.
Walker next contends that the trial court committed plain error in its instruction to the jury on the balancing of the aggravating and mitigating circumstances in determining his sentence. According to Walker, the trial court's instruction mirrors the instruction this Court held to be plain error in Ex parte Bryant, [Ms. 1990901, June 21, 2002] 951 So.2d 724, 727 (Ala.2002).
In Ex parte Bryant, this Court held that the trial court committed plain error when during the penalty-phase instructions to the jury it invited the jury to recommend a sentence of death without finding the existence of any aggravating circumstance. We held that the following instruction by the trial court constituted reversible error:
"`I charge you, members of the jury; that if you do not find that an alleged aggravating circumstance was proved, that does not automatically or necessarily mean that you should sentence Mr. Bryant to death by electrocution, instead such a finding only means that you must consider other factors, more specifically mitigating circumstances, before deciding whether a sentence of life in prison or death by electrocution is present.'"
951 So.2d at 727. As this Court explained in Ex parte McNabb, 887 So.2d 998 (Ala. 2004), it was the court's invitation in Ex parte Bryant to recommend a sentence of death without finding any aggravating circumstance that was plain error.
We have reviewed the trial court's penalty-phase instruction in this case, and we conclude that the trial court's instruction did not constitute plain error; the trial court did not invite the jury in Walker's case to recommend a sentence of death without finding any aggravating circumstance. The trial court's penalty-phase instruction here with regard to the statements of law concerning the balancing of the aggravating and mitigating circumstances is identical to the penalty-phase instruction given by the trial court in Ex *744 parte McNabb, 887 So.2d at 1000-03. As we concluded in Ex parte McNabb,
"although the court did not Specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error `seriously affected] the fairness, integrity or public reputation of [these] judicial proceedings,' Ex parte Davis, 718 So.2d [1166] at 1173-74 [(Ala.1998)], so as to require reversal of the sentence."
887 So.2d at 1004.
No plain error exists in Walker's trial in this regard.

C. Claims of alleged prosecutorial misconduct.
Walker contends that the prosecutor engaged in misconduct that denied him a fair trial and an accurate sentence determination. Walker did not object at trial to any of the alleged misconduct he now raises before us. Therefore, he must establish plain error.
"In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the United States Supreme Court stated the following concerning a prosecutor's responsibility:
"`The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
"`It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'
"295 U.S. at 88, 55 S.Ct. 629. `"A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury."' Reeves v. State, 807 So.2d 18, 44-45 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997). The standard for evaluating the propriety of a prosecutor's argument is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
"`"A prosecutor may argue in closing any evidence that was presented at trial. He may also `"present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way."' Williams v. State, 601 So.2d 1062, 1073 (Ala.Cr.App.1991), aff'd without opinion, 662 So.2d 929 (Ala. 1992), quoting Donahoo v. State, 505 So.2d 1067, 1073."' *745 "Broadnax v. State, 825 So.2d 134, 208 (Ala.Crim.App.2000), quoting Williams v. State, 627 So.2d 994 (Ala.Crim.App. 1992), aff'd, 627 So.2d 999 (Ala.1993)."
Turner v. State, 924 So.2d 737, 766-67 (Ala.Crim.App.2002).
First, Walker maintains that the prosecutor improperly vouched for the credibility of a witness for the State. The State presented testimony from Timothy Byrd, a former cell mate of Walker's, who testified that Walker admitted to him that he shot Thweatt. During Byrd's testimony, the State and Walker elicited testimony from Byrd' that he had repeatedly petitioned the court and the district attorney for leniency in his sentences. The prosecutor, when questioning Byrd on redirect examination and later on cross-examination when Byrd was called as a witness for the defense, asked questions attempting to establish that the prosecutor's office did not at any time support a lenient sentence for Byrd. Additionally, the prosecutor elicited testimony from Byrd that indicated that by testifying Byrd had placed his safety in danger if he was sent back to prison. Walker consistently asked questions attacking Byrd's credibility and tending to establish the inference that Byrd was biased in favor of the State and had received a lesser sentence in exchange for his testimony. During closing argument the prosecutor stated:
"We called Tim Byrd. . . . You don't believe the District Attorney; I knew about the prior conviction. You don't believe I know he wrote me a letter? You don't believe your DA who you are looking at, that you elected. . . . But didn't make no deals."
Additionally, the prosecutor commented that Byrd testified against Walker because "Where is nothing more evil and wicked in this community than [Walker] and Beckworth."
The law concerning a prosecutor's vouching for the credibility of a witness is well settled.
"A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. `[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.' Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 Sold 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`"Attempts to bolster a witness by vouching for his credibility are normally improper and error." . . . The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. . . . This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. . . . Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.'
"United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984)."
DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
Reading the prosecutor's comments in context and considering them in light of the entire record, we do not find plain error. Even if we were to conclude that the prosecutor vouched for the veracity of *746 Byrd's testimony or placed the weight of the State behind Byrd's testimony and that in doing so erred, we cannot conclude that the statements when read in light of the entirety of the record affected the fairness of Walker's trial. See Turner, supra. Therefore, the record does not establish plain error.[3]
Walker further contends that the prosecutor improperly expressed his opinion that Walker deserved to be found guilty of capital murder and to be sentenced to death. Walker directs this Court to the following statements made by the prosecutor during closing arguments:
"The State has an interest in this case. The law has passed certain circumstances where the State can prosecute people who commit the most evil, wicked, heinous type crimes in this community and this is one.
". . . .
"This is the worst case. Children, elderly people need protection. This is the worst of the worst. Do not make a mistake on this case."
Additionally, Walker provides a "grocery list" of alleged misconduct during the prosecutor's closing argument, including that the prosecutor improperly: argued that Walker lacked self control; asked the jury to send a "message" to the community; compared Walker's rights to the rights of the victim; urged the jury to consider Thweatt's age and position, in the community when determining Walker's sentence; and injected religion into the trial.
As the Court of Criminal Appeals has held:
"`It is not enough that a prosecutor's comment in closing arguments was undesirable or even universally condemned; the question instead is whether the comment "so infected the trial' with unfairness as to make the resulting conviction a denial of due process." Burton [v. State], 651 So.2d [641,] 651 [(Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994)], quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
"` . . . [A]s we have previously stated, a prosecutor's comment must be viewed as delivered in the heat of debate, and, as such, is usually valued by the jury at its true worth. "`[W]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair. The solicitor is yet under duty to prosecute with earnestness and vigor to strike hard blows, but not foul ones.' Berger v. United States, [295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ]." Taylor [v. State], 666 So.2d [36,] 64 [(Ala.Cr.App.1994)], quoting Arant v. State, 232 Ala. 275, 280, 167 So. 540, 544 (1936).'
"Melson v. State, 775 So.2d 857, 885 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000).
". . . Retribution is a proper subject of prosecutorial argument. Perkins v. State, 808 So.2d 1041 (Ala.Crim.App. 1999); McWilliams v. State, 640 So.2d 982, 1001 (Ala.Crim.App.1991), aff'd in pertinent part, rem'd, 640 So.2d 1015 (Ala.1993). See also Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App. 1997) (there is no impropriety in a prosecutor's appeal to the jury for justice); Kuenzel v. State, 577 So.2d 474, 498 (Ala.Crim.App.1990) (retribution is a valid consideration in sentencing) (quoting Johnson v. Wainwright, 778 F.2d 623, *747 630 (11th Cir.1985)), aff'd, 577 So.2d 531 (Ala.1991)."
Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___, ___ (Ala. Crim.App.2000), rev'd in part on other grounds, [Ms. 1010267, March 14, 2003]' ___ So.2d ___ (Ala.2003).
We have reviewed in their entirety the prosecutor's arguments' Walker says improperly expressed the opinion that Walker deserved to be found guilty." [U]rging the jury to render a verdict in such a manner as to punish the crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument." Sockwell v. State, 675 So.2d 4, 36 (Ala. Crim.App.1993). Many of the comments were replies-in-kind to Walker's arguments and legitimate inferences from the record. Additionally, the comments were delivered in the heat of debate. No plain error exists.
Walker also contends that during the guilt phase of his trial, the prosecutor improperly argued facts not in evidence, demonstrated how the attack on Thweatt occurred, and improperly informed the jury that Walker was known to a law-enforcement officer before the offense for which he was being tried occurred. After reviewing the testimony and the arguments, we conclude that no plain error occurred in this regard. Although some of the prosecutor's statements were questionable, the prosecutor's argument did not "`so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Turner, 924 So.2d at 767 (quoting Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).
Next, Walker contends that the prosecutor improperly presented victim-impact evidence and argument during the guilt phase of his trial. During his opening argument, the prosecutor provided some factual information about Thweatt, including her age, her family history, her activities in the community, and her character. Additionally, the State presented testimony from one of Thweatt's daughters and a friend.
In Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995), this Court held:
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the defendant] did not receive a fair trial simply because the jurors were told what they probably had already suspectedthat [the victim] was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991))."
Although portions of the argument and testimony during the guilt phase of Walker's trial may have been inappropriate, we unequivocally conclude that the testimony and the argument had no prejudicial impact on Walker's trial. Cf. Calhoun v. State, 932 So.2d 923, 968-69 (Ala.Crim. App.2005), and the cases cited therein, holding that the improper admission of victim-impact evidence during the guilt phase did not constitute reversible error.
Finally, Walker contends that the cumulative effect of the alleged instances of prosecutorial misconduct deprived him of due process and a fair trial. Because Walker has not demonstrated that his claims of prosecutorial misconduct are any stronger when the instances of misconduct are considered cumulatively, we find no error. See Ex parte Slaton, 680 So.2d 909, 918 (Ala.1996).

*748 D. Alleged improper admission into evidence of Walker's statement.

Walker contends that the trial court committed reversible error when it admitted the videotaped statement he made at Thweatt's house. According to Walker, because the record does not establish that the State had probable cause to arrest him and the State did not produce evidence of probable cause at the suppression hearing, his arrest was unlawful and his videotaped statement made subsequent to his arrest was inadmissible as the fruit of the poisonous tree.
The record indicates that on June 22, 23, and 27, 2000, while Walker was being detained by the Etowah County Sheriff's Department, Houston County law-enforcement officers questioned Walker about Thweatt's murder. The record also indicates that on June 28, 2000, the Etowah County Sheriff's Department released Walker into the custody of Houston. County law-enforcement officers, who transported Walker from Etowah County to the Houston County jail. While Walker was being transported, the Houston County law-enforcement officers and Walker stopped at the scene of the murder, and Walker made a videotaped statement detailing facts about the murder. Walker was indicted on September 1, 2000, for capital murder for the killing of Thweatt. The record does not indicate that Walker requested a preliminary hearing between June 28, 2000, and September 1, 2000.
On October 28, 2002, Walker filed a "motion to dismiss or remand the indictment." In his motion, Walker alleged various defects in the indictment, but he did not allege that the indictment was not supported, by probable cause. The trial court denied the motion without conducting a hearing.
Additionally, on October 28, 2002, Walker filed a motion to suppress his statement made to the Houston County law-enforcement officers because, he said, among other grounds, it was obtained subsequent to an arrest not supported by probable cause. Specifically, he stated that "[he] was seized and interrogated on less than probable cause, in violation of [his] Fourth and Fourteenth Amendment rights." Walker's motion to suppress did not contain any facts supporting his allegation, nor did he attach an affidavit containing supporting facts.
On February 19, 2003, the trial court conducted a hearing on Walker's motion to suppress. The State presented evidence concerning the voluntariness of Walker's statement but did not present evidence concerning probable cause to support Walker's arrest. At the hearing, Walker did not pursue his allegation that his arrest was not supported by probable cause. Although his counsel actively participated in the hearing and cross-examined the State's witnesses, Walker's counsel did not argue to the trial court that Walker's arrest was not supported by probable cause. Additionally, he did not ask the trial court to reconsider its denial of his motion to suppress in light of his allegation that his arrest was unlawful; he did not object at trial on this ground when his statement was admitted; he did not present this objection in his motion for a new trial; and he did not present this objection to the Court of Criminal Appeals. Thus, the record on its face establishes that at the suppression hearing, at trial, and on appeal to the Court of Criminal Appeals, Walker, by his silence, abandoned this allegation and waived his objection to the admission of his statement on this ground. See Burks v. State, 600 So.2d 374, 381 (Ala. Crim.App.1991) ("It appears that the issue of probable cause for arrest was never raised or litigated at trial and is not preserved for review by this Court.").
*749 Walker's waiver of the alleged error, however, does not preclude our review because Walker was indicted for capital murder and was sentenced to death, see Rule 39(a)(2)(D), Ala. R.App. P. Walker's waiver, however, weighs heavily against a finding of plain error.
"`The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr. App.1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).'
"Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002).
"`"The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception. . . .
"`"The contemporaneous objection rule . . . promotes the salutary interest of making the trial the main event. Failure to enforce it `tends to detract from the perception of the trial of a criminal case . . . as a decisive and portentous event.' Wainwright v. Sykes, 433 U.S. 72, 90 (1977). Moreover, requiring timely objections allows the trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948-49 (11th Cir.1988). A full record and, a prior decision in the district court are essential ingredients to our substantive review of the issuesthey flesh out an issue in a way the parties' briefs may not.
"`"`In the absence of plain error . . . it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate.' Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n. 12 (11th Cir.1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that `the plain error test is difficult to meet.' United States v. King, 73 F.3d 1564, 1572 (11th Cir.1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981)."
"`United States v. Pielago, 135 F.3d 703, 709 (11th Cir.1998).
"`"While the plain error doctrine lessens the blow of a rigid application of the contemporaneous objection requirement, it is to be used sparingly, since the unwarranted extension of the exacting definition *750 of plain error would skew the rule's careful balancing of the need to encourage all trial participants to seek a fair and accurate trial the first time around against the insistence that obvious injustice be promptly redressed. Reviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection."
"`5 Am.Jur.2d Appellate Review § 767, p. 437 (1995). See also Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (the plain-error exception is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result") (internal quotes and citations omitted [in Thomas]).

"`One of the factors for the reviewing court to consider in its determination of whether an alleged error constitutes plain error is "whether a proper and timely objection at trial would have cured the error or would have enabled the trial court to prevent injustice." 5 Am.Jur.2d, supra, at § 774, p. 443-45 (footnotes omitted). "[T]he doctrine [of plain error] is less likely to be applied where the error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue." Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 27.5(d), p. 1160 (2nd ed.1992). See, e.g., United States v. Hayes, 589 F.2d 811, 825 (5th Cir.) ("[The plain-error rule] will not be used to allow counsel for the defendant to gamble first on acquittal and then, upon conviction, to raise on appeal any matters which could have been easily remedied at trial."), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). See also Jones v. United States, 527 U.S. 373, 386, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (preservation-of-error requirements "enable a trial court to correct any instructional mistakes before the jury retires and in that way help to avoid the burdens of an unnecessary retrial"). . . . '
"Thomas v. State, 824 So.2d 1, 14-15 (Ala.Crim.App.1999)."
Clark v. State, 896 So.2d 584, 622-24 (Ala.Crim.App.2000) (final bracketed language added).
Under the principles of the plain-error doctrine set forth in Clark, the fact that Walker, in his motion to suppress, made a bare allegation that his arrest was not supported by probable cause and then failed to pursue his objection to the statement on that basis at the suppression hearing, at trial, and in subsequent pleadings weighs heavily against a finding of plain error.
In light of the facts in this case, we reject the assertion that once Walker made this allegation in his motion to suppress, he had no additional burden in presenting this issue to the trial court at the suppression hearing. Walker's allegation in his motion contained no supporting facts to establish that Walker had been arrested without probable cause. Therefore, it was an allegation based on speculation and conjecture. The trial court conducted a hearing, at which Walker could have pursued this legal theory, objected to the State's alleged lack of evidence of probable cause to arrest, presented evidence to support his allegation, and argued that the lack of evidence required that his statement be suppressed. Walker, however, remained silent; he did not pursue this issue in the trial court; and he did not allow the trial court the opportunity to prevent the alleged injustice. See Adams v. State, 585 So.2d 161, 164 (Ala.1991) ("Matters not objected to at trial cannot be considered for *751 the first time on appeal, since review on appeal applies only to rulings by the trial court."). Cf. Coulliette v. State, 857 So.2d 793, 795 (Ala.2003) (holding that because a specific argument raised on appeal was not presented at suppression hearing, "`[t]he motion [to suppress] did not give the trial court notice of the specific issues [the defendant] . . . raise[d] in his [appellate] brief. . . . Therefore, the trial court did not have the opportunity to rectify these alleged errors. . . . [The defendant's] motion was not sufficient to preserve the issues presented by [him] in his brief.'" (quoting Acree v. State, 673 So.2d 855, 856 (Ala. Crim.App.1995))). Walker's silence and abandonment of this ground in the trial court essentially allowed Walker to "`gamble first on acquittal and then, upon conviction, to raise on appeal [an issue] which could have been easily remedied at trial.'" Clark, 896 So.2d at 624 (quoting United States v. Hayes, 589 F.2d 811, 825 (5th Cir.1979)). This fact weighs heavily against Walker.
In defining plain error, this Court has adopted principles established by the United States Supreme Court in applying the federal plain-error rule. In Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), this Court, following those principles, stated: "`"Plain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" In United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the United States Supreme Court held that for an error to constitute plain error the error must be "plain" and must affect the defendant's "substantial rights." The United States Supreme Court explained:
"[The plain-error rule] defines a single category of forfeited-but-reversible error. Although it is possible to read the Rule in the disjunctive, as creating two separate categories`plain errors' and `defects affecting substantial rights' that reading is surely wrong. See [United States v.] Young, 470 U.S. [1], at 15, n. 12 [(1985)] (declining to adopt disjunctive reading). As we explained in Young, the phrase `error or defect' is more simply read as `error.' Ibid. The forfeited error `may be noticed' only if it is `plain' and `affect[s] substantial rights.' More precisely, a court of appeals may correct the error (either vacating for a new trial, or reversing outright) only if it meets these criteria. . . .
"The first limitation on appellate authority under [the plain-error rule] is that there indeed be an `error.' Deviation from a legal rule is `error' unless the rule has been waived. For example, a defendant who knowingly and voluntarily pleads guilty in conformity with the requirements of Rule 11[, Fed. R.Crim.P.,] cannot have his conviction vacated by court of appeals on the grounds that he ought to have had a trial. Because the right to trial is waivable, and because the defendant who enters a valid guilty plea waives that right, his conviction without a trial is not `error.'
"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the `intentional relinquishment or abandonment of a known right.' . . . Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. . . . Mere forfeiture, as opposed to waiver, does not extinguish an `error' under [the plain-error rule]. Although in theory it could be argued that `[i]f the question was not presented to the trial court no error was committed by the trial court, hence there is nothing to review,' *752 . . . this is not the theory that [the plain-error rule] adopts. If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an `error' within the meaning of [the plain-error rule] despite the absence of a timely objection.
"The second limitation on appellate authority under [the plain-error rule] is that the error be `plain.' `Plain' is synonymous with `clear' or, equivalently, `obvious.'
"The third and final limitation on appellate authority under [the plain-error rule] is that the plain error `affec[t] substantial rights.' This is the same language employed in [the harmless-error rule], and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the . . . court proceedings. . . . When the defendant has made a timely objection to an error and [the harmless-error rule] applies, a court of appeals normally engages in a specific analysis of the district court recorda so-called `harmless error' inquiryto determine whether the error was prejudicial. [The plain-error rule] normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial. See Young, supra, 470 U.S., at 17, n. 14 (`[F]ederal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error . . . had [a] prejudicial impact on the jury's deliberations'). This burden shifting is dictated by a subtle but important difference in language between the two parts of Rule 52: While [the harmless-error rule] precludes error correction only if the error `does not affect substantial rights' (emphasis added), [the plain-error rule] authorizes no remedy unless the error does `affec[t] substantial rights.'"
507 U.S. at 731-35, 113 S.Ct. 1770.
Thus, to find plain error, this Court must conclude that the trial court erred in admitting Walker's videotaped statement because the statement was made subsequent to an arrest not supported by probable cause, that the error is obvious on the face of the record, and that the error affected his substantial rights.
In George v. State, 717 So.2d 827, 837 (Ala.Crim.App.1996), rev'd on other grounds, 717 So.2d 844 (Ala.1996), the Court of Criminal Appeals confronted facts similar to those in this case, stating:
"The appellant contends that the trial court erred when it received into evidence certain items seized as a result of the appellant's arrest without first requiring the state to prove the legality of the appellant's arrest. The appellant did not challenge the validity of his arrest at trial. Thus, we must evaluate this contention under the plain error doctrine. Rule 45A, Ala. R.App. P.; Haney [v. State, 603 So.2d 368 (Ala. Crim.App.1991)].
"Both the indictment and the arrest warrant are contained in the record. `"On the question of probable cause, it is well established that the indictment itself, together with proof that the defendant is the one named in it, is prima facie evidence of probable cause."' Roynica v. State, 54 Ala.App. 436, 441, 309 So.2d 475, 478-79 (1974), cert. denied, 293 Ala. 772, 309 So.2d 485 (Ala.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85 (1975), quoting United States v. Mayer, 22 F.2d 827 (D.C.1927). There is no evidence in the record to support a finding that the appellant's *753 arrest was in any way unlawful. The trial court did not err."
Based on the record before us, we cannot conclude that the trial court erred in admitting Walker's videotaped statement into evidence. Although the record does not contain a copy of the arrest warrant as did the record in George, it does, contain a copy of the indictment and evidence indicating that Walker is the person named in the indictment. Thus, at the time the trial court conducted the hearing on Walker's motion to suppress, the indictment provided prima facie evidence of probable cause that Walker had committed the offense charged. Although the probable cause supporting the indictment against Walker does not establish probable cause to support Walker's arrest, see Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), the issuance of the indictment established that there was evidence of probable cause to support the charge against Walker. Consequently, Walker had an obligation to present the trial court with more than a mere allegation that there was no probable cause to support his arrest to warrant further inquiry and suppression of the statement. Cf. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (recognizing that the initial burden is upon the party seeking suppression of the evidence to go forward with specific facts demonstrating that the evidence is tainted). Indeed, nothing in the record suggests that Walker's arrest was not supported by probable cause or that the evidence Walker sought to suppress was gotten illegally. In light of these facts and in light of Walker's failure to pursue his contention at the hearing, we cannot conclude that the trial court erred in admitting Walker's videotaped statement without requiring the State to present additional evidence of probable cause.
Additionally, the alleged error is not plain because plain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error. Our precedent holds that the record must at least present an inference of error before an appellate court will hold that reversible error occurred. For example, in Ex parte Watkins, 509 So.2d 1074 (Ala. 1987), this Court conducted a plain-error review of an alleged violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (addressing a constitutional violation with regard to discrimination in jury selection). We stated:
"Because this issue is raised for the first time on appeal, the defendant has requested that we review the record under our plain error rule, Rule 39(k), Ala. R.App. P., and remand for further proceedings, as we did in [Ex parte] Jackson, [516 So.2d 768 (Ala.1986)]. However, we have carefully reviewed the record in this respect and we cannot find any plain error. Although the record does show that the defendant is black and the victim was white, it does not show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire. The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination. Under the plain error rule this Court will `notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.' (Emphasis added.) Rule 39(k), supra. The defendant cannot successfully argue that error is plain in the record *754 when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks). In both Jackson and [Ex parte] Godbolt[, 546 So.2d 991 (Ala. 1987),] the records were sufficient to show that prima facie cases of purposeful discrimination could be made by the defendants; therefore, those cases were remanded for determinations on the issue under the guidelines set out in Batson."
509 So.2d at 1076-77 (second emphasis added). Thus, the Watkins Court established that when nothing in the record supports the bare allegation that a constitutional violation occurred, a court cannot find plain error. See also White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991) (holding that a Batson claim could not be addressed on appeal when the record did not even raise the inference of unconstitutional jury selection). Cf. Brooks v. State, 929 So.2d 491 (Ala.Crim.App.2005) (holding that an ambiguous or silent record will not support a claim of ineffective assistance of counsel).
In another analogous situation, this Court held that a bare allegation in a motion was sufficient to notice error and warrant further review only because the record affirmatively reflected the alleged error. In Ex parte Jefferson, 749 So.2d 406 (Ala.1999), this Court addressed Jefferson's ineffective-assistance-of-counsel claim, made in his motion for a new trial. Jefferson pleaded guilty to possession of a controlled substance. He filed a motion for a new trial, arguing that his counsel had been ineffective. His motion did not set forth any facts supporting his claim. The Court of Criminal Appeals held that because the motion for a new trial raised only a general claim of ineffective assistance of counsel, the claim was not properly presented to the trial court or preserved for appellate review. In his petition for a writ of certiorari to this Court, Jefferson contended that facts in the record supported his motion and, therefore, that he was not required to make a more specific assertion. See Hill v. State, 675 So.2d 484 (Ala.Crim.App.1995) (holding that when the grounds stated in the motion for a new trial are evident in the record a hearing is warranted even though the motion is not supported by affidavits or other extrinsic evidence). Jefferson argued that the record on its face established that his counsel was ineffective for failing to investigate whether the substance found in his possession was a controlled substance and allowing him to plead guilty to possession of a controlled substance, because the toxicology report, which was in the record, indicated that the substance found in his possession was not a controlled substance. This Court held that because the record on appeal affirmatively reflected that Jefferson's trial counsel's performance had been deficient, there was no need for a more specific allegation in his motion; the issue was properly preserved for appellate review; and the Court of Criminal Appeals erred in not remanding the case for a hearing on Jefferson's ineffective-assistance-of-counsel claim.
Indeed, the Court of Criminal Appeals applied the principles set forth in Watkins and Jefferson to a plain-error review conducted in Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002), in which a capital-murder defendant argued that the trial court committed plain error when it admitted into evidence his post-arrest statement to law enforcement because, he said, the statement was the fruit of the poisonous tree. According to Turner, his statement was a consequence of his allegedly illegal arrest. Because Turner had not challenged the legality of his arrest or the admission of his statement at trial, the Court of Criminal Appeals reviewed the record for plain error. The court noted *755 that because Turner did not object at trial, the record did not set forth the facts surrounding his arrest, and nothing in the record offered any "suggestion of illegality." Therefore, the court held that because the record on its face did not support a finding that Turner's arrest was not supported by probable cause, the court could not find plain error with regard to the admission of Turner's statement made subsequent to the arrest. 924 So.2d at 757-58. Essentially, the Court of Criminal Appeals held that because the alleged error was not "obvious" on the face of the record, it did not rise to the level of plain error.
The alleged error Walker asserts is not obvious and, therefore, cannot be plain error. The record before us, like the records in Watkins and Turner, does not suggest any illegality with regard to Walker's arrest. Additionally, unlike the record in Jefferson, which affirmatively supported the alleged error, nothing in this record affirmatively suggests that Walker was arrested on less than probable cause. In light of the sparsity of the record with regard to the facts surrounding Walker's arrest, Walker's alleged error is not obvious on the face of the record and, therefore, does not rise to the level of plain error. Cf. Ex parte Meeks, 434 So.2d 844 (Ala.1983) (providing an example of an obvious error when the suppression hearing contained testimony directed toward probable cause to arrest the defendant, but the testimony did not establish probable cause).
Likewise, we do not find plain error because the record does not establish that the alleged error adversely affected Walker's substantial rights. See Olano, supra. For us to hold that the videotaped statement was improperly admitted and that its improper admission affected or probably affected Walker's trial, the record had to establish that Walker's arrest was not supported by probable cause. Walker's contention of plain error in this regard is supported only by speculation from a silent record, and speculation will not support a finding of prejudice. Additionally, because the record does not suggest any illegality with regard to Walker's arrest, we cannot conclude the alleged error seriously affected the fairness, integrity, or public reputation of this proceeding. See Ex parte Price, 725 So.2d 1063 (Ala.1998). Indeed, the inability to establish prejudicethe miscarriage of justiceis the reason that claims involving lack of probable cause to support an arrest that are not litigated at trial are often presented as claims of ineffective assistance of counsel. See Hunt v. State, 940 So.2d 1041 (Ala.Crim.App.2005).
No plain error exists with regard to the admission of Walker's videotaped statement.
E. Alleged error in trial court's finding that the offense was "especially heinous, atrocious, or cruel compared to other capital offenses."
Last, Walker contends that the trial court erred in finding the existence of the aggravating circumstance that "the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." See 13A-5-49(8), Ala.Code 1975. According to Walker, the trial court relied on the jury's verdict and not on the evidence to reach its conclusion that the offense was especially heinous, atrocious, or cruel. A reading of the trial court's order in its entirety, however, clearly establishes that the trial court relied on the evidence in finding the existence of this aggravating circumstance. The trial court specifically noted:
"[W]ith respect to the second aggravating circumstance, Dr. Parades testified that an 87-year-old woman was brutally beaten prior to being shot in the head at close range. He established that these *756 injuries were painful and preceded death. This type of cruelty was unnecessary given the age and physical infirmities experienced by the victim."
The trial court conducted an independent review of the evidence before concluding that this aggravating circumstance existed. Walker's contention is not supported by the record.
Walker further argues that the evidence does not establish beyond a reasonable doubt
"that the victim suffered `physical violence beyond that necessary to cause death' of which the victim was `conscious and aware,' that the victim `appreciabl[y] suffer[ed]' or experienced `psychological terror' such that the application of the circumstance is appropriate."
(Walker's petition at 98.) Walker directs this Court to Lawhorn v. State, 581 So.2d 1159, 1174-75 (Ala.Crim.App.1990), in which the. Court of Criminal Appeals noted that
"Alabama has restricted its `heinous, atrocious, or cruel' circumstance to application only in a crime `of such nature that it is "conscienceless or pitiless" and "unnecessarily torturous to the victim,"' Ex parte Whisenhant, 555 So.2d 235, 244 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981))."
We, however, reject Walker's cursory summarization of the evidence and conclude that the evidence supports a finding that the offense was "conscienceless or pitiless" and "unnecessarily torturous to the victim." The record establishes that Thweatt was an 87-year-old, five-feet-one-inch, 112-pound female, who suffered nine lacerations resulting from blunt-force trauma to the head before suffering a fatal gunshot wound at close range to her face. Dr. Alfredo Parades, the forensic pathologist who examined Thweatt's body, testified that the laceration over the left side of the cheekbone and corner of the eye was also associated with multiple fractures of the orbit and cheekbones. Dr. Parades stated unequivocally that the blunt-force-trauma injuries were inflicted while Walker was alive. Additionally, Dr. Parades opined that Thweatt's wounds indicated that they were not inflicted at once, but over a period of time, and that she was alive during the beating. Without question, the evidence established that the assault upon Thweatt was beyond that necessary to cause death.
Moreover, the record establishes that Thweatt suffered great pain throughout the assault. Dr. Parades opined:
"The magnitude of the pain I cannot speak for it. But, I do think she had to have a lot of pain. All of these injuries were independent of each other. There was no confluent injury. Like the one above the left eyebrow was close [to another injury to her face] but it doesn't mean that they were created by one blow. To me it was two separate blows, so she must have been in some pain for all of the injuries to develop and be produced."
Dr. Parades consistently maintained that Thweatt had been in pain as a result of the injuries inflicted and that nothing in the condition of her body indicated that she had slipped into unconsciousness at any time before she was fatally shot.
Furthermore, the record establishes that Thweatt experienced fear before the fatal gunshot wound. Evidence was presented indicating that Thweatt attempted to evade the attack by closing a door, but the door had been kicked off its hinges. Additionally, the evidence that she was beaten before she was shot and that she was alive until the fatal gunshot wound suggests that she experienced fear. Ex *757 parte Rieber, 663 So.2d 999, 1003 (Ala. 1995).
Viewing the evidence in its entirety, the trial court could have concluded from the evidence, the State presented that the murder of Thweatt that occurred during the course of a burglary was beyond a reasonable doubt "especially heinous, atrocious, or cruel compared to other, capital offenses."

Conclusion
Based on the foregoing, the judgment of the Court of Criminal. Appeals is affirmed.
AFFIRMED.
SEE, SMITH, and BOLIN, JJ., concur. MURDOCK, J., concurs in the result.
LYONS, WOODALL, and PARKER, JJ., dissent.
PARKER, J., files statement of nonrecusal.
COBB, C.J., recuses herself.
MURDOCK, Justice (concurring in the result).
I write separately to address the question of plain error as it relates to the admission at trial of the videotaped statement made by Walker after he was taken into custody by Houston County officials.
Regardless of whatever other requirements generally must be met in order to establish plain error, in relation to the issue whether the videotaped statement was obtained incident to an arrest that was unlawful because it was without probable cause, logically one of three things must be true if we are to say that the trial court. "plainly erred" by admitting that statement into evidence at trial. It must be shown either (1) that the trial court had determined (or that it was undisputed) that the arrest was indeed made without probable cause, (2) that, although the trial court had not affirmatively made such a determination, the fact that the arrest was made without probable cause was "plain" from the record, or (3) that (a) it was "plain" that the State had an obligation at trial to put on evidence proving that there was probable cause for Walker's arrest, because it was plain that Walker maintained that there was not, but the State did not do so, and (b) it was "plain" that the record was insufficient to establish probable cause or some other lawful basis for the arrest. In this case, however, none of these predicates exist. First, the trial court did not determine that Walker's arrest was without probable cause. Second, the record does not "plainly" indicate that the arrest was made without probable cause.
As to the third predicate, unlike other evidentiary showings that must always be made by the State before certain types of evidence can be admitted, the State had an obligation at trial to put on evidence proving that Walker's arrest was made with probable cause only if Walker maintained the position that his arrest was unlawful. Accordingly, plain error would exist if Walker plainly had maintained that position (thereby plainly obligating the State to put on evidence to the contrary), but the record nevertheless plainly was insufficient to establish a lawful arrest and the trial court proceeded to admit the statement and allow the jury to consider it. It is my conclusion that, even if Walker plainly maintained that position (a proposition disputed by the main opinion), it was not plain, and would not have been plain to the trial court, that the record was insufficient to establish a lawful arrest and subsequent detention. The trial court therefore did not plainly err by admitting into evidence a statement made by Walker incident to that arrest and detention.
The record reflects that Walker was arrested by the Hokes Bluff police in Etowah County on June 20, 2000. A Hokes *758 Bluff police officer testified at trial that, before his arrest of Walker, a television program aired in the Etowah County area purporting to link Walker and his stepbrother, Rex Allen Beckworth, to Thweatt's murder. The officer (who also testified that he had viewed the portion of the program concerning Walker and his stepbrother) explained that he subsequently received a tip from a confidential informant that Walker and his stepbrother could be found in a particular mobile home located in Hokes Bluff. The officer testified that, after arriving at the mobile home, he identified himself in a loud voice as a Hokes Bluff police officer. According to the officer's testimony, when a woman came to the door and asked what the officer wanted, he responded: "[W]e were told there are some people here that we have warrants for. We would like to look inside." After the woman allowed the officer into the home, Walker's stepbrother (who also was eventually convicted of Thweatt's murder) fled the mobile home through another door. Walker was captured while hiding behind a piece of furniture.
Moreover, at an August 2003 hearing on a motion in limine,[4] Walker's counsel admitted to the trial court that "there were outstanding warrants on Mr. Walker" at the time of his arrest in Etowah County and that he was "on the run because he was wanted in . . . other alleged crimes" of burglary and breaking and entering a motor vehicle in Houston County. See United States v. Green, 111 F.3d 515, 522 (7th Cir.1997) (holding that evidence obtained from a search made subsequent to an illegal stop was admissible when, before the search, the police officer discovered that there was an outstanding arrest warrant for the defendant, and the defendant was thereupon arrested pursuant to that warrant); see also, e.g., Myers v. State, 395 Md. 261, 295, 909 A.2d 1048, 1068 (2006) (reviewing other cases to the same effect).
In light of the foregoing, I cannot conclude that it was plain, or that it should have been plain to the trial court, that the record did not sufficiently establish the lawfulness of Walker's arrest and continued detention leading up to the making of the statement at issue.
LYONS, Justice (dissenting).
I share Justice Woodall's concerns regarding the failure of the main opinion to recognize the State's burden of showing an arrest supported by probable cause in light of Walker's assertion in his motion to suppress of lack of probable cause for his arrest. Likewise, I agree with Justice Woodall's rejection of the reliance in the main opinion upon the fact of a subsequent indictment as prima facie evidence of probable cause for an antecedent arrest. As the court in Radvansky v. City of Olmsted Falls, 395 F.3d 291, 307 n. 13 (6th Cir. 2005), recently noted:
"[N]either the Supreme Court, nor this court, has ever held that a subsequent grand jury indictment can establish probable cause for an earlier arrest. See Rios v. United States, 364 U.S. 253, 261, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) (evaluating probable cause based on the circumstances at the time of arrest despite the fact that the defendant was later indicted by a federal grand jury); Giordenello v. United States, 357 U.S. 480, 487, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (holding that in the absence of a prior indictment, probable cause for arrest is determined by the facts in the sworn complaint); United States v. *759 Bowker, 372 F.3d 365, 374 (6th Cir.2004) (analyzing probable cause to arrest based on evidence before the warrant-issuing magistrate judge even though the defendant was later indicted by a grand jury); United States v. Bartholomew, 310 F.3d 912, 919 (6th Cir.2002), cert. denied, 537 U.S. 1177, 123 S.Ct. 1005, 154 L.Ed.2d 923 (2003) (assessing the existence of probable cause to arrest a later-indicted defendant based on the facts that police knew at the time of arrest); see also Smith v. Thornburg, 136 F.3d 1070, 1077 (6th Cir.1998) (concluding that police had probable cause to arrest the suspect despite the fact that he was not indicted later by a grand jury). What we have previously held implicitly, we now state explicitlyafter-the-fact grand jury involvement cannot serve to validate a prior arrest. See Garmon v. Lumpkin County, 878 F.2d 1406, 1409 (11th Cir.1989) CA subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place.')."
(Some emphasis original; some emphasis added.)
I therefore respectfully dissent.
WOODALL, Justice (dissenting).
In my opinion, this Court should recognize as plain error the trial court's admission into evidence of a videotape containing statements by Walker. The recognition of such plain error would result in the reversal of the judgment of the Court of Criminal Appeals and in a remand for a new trial. Therefore, I respectfully dissent.
This case involves the senseless and horrible murder of Bessie Lee Thweatt. As the lead opinion acknowledges, James Earl Walker was arrested in Etowah County after "[l]aw-enforcement officers from the Houston County Sheriffs Department suspected Walker and Rex Allen Beckworth, residents of Etowah County, of the murder." 972 So.2d at 740 (emphasis added). During questioning in Etowah County by Houston County law-enforcement officers, Walker admitted to being outside Thweatt's house at the time of her murder. While Walker was being transported to Houston County, law-enforcement officers stopped at Thweatt's residence, where Walker made a videotaped statement describing his version of the events on the night Thweatt was killed. Walker, who was arrested in June 2000, was not indicted for the capital murder of Thweatt until September 1, 2000.
Walker filed a motion to suppress the statements he had given to the law-enforcement officers. The motion to suppress contained several grounds, and stated:
"James Earl Walker respectfully moves this Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama Constitution, and applicable state law, to suppress any statements that he allegedly made to any law enforcement officers in connection with this case as evidence against him in the prosecution's case-in-chief, as rebuttal evidence or as impeachment evidence.
"1. James Earl Walker is charged with capital murder.
"2. The State has furnished counsel for Mr. Walker with statements he allegedly gave to the police in connection with this case.
"3. At the time of his questioning, Mr. Walker had become the focus of the investigation of the death of the alleged victim in this case.
"4. Mr. Walker did not give the statements voluntarily and intelligently.

*760 "5. Statements allegedly given by suspects to the police are prima facie involuntary in Alabama.
"6. The defendant was seized and interrogated on less than probable cause, in violation of his Fourth and Fourteenth Amendment rights. Dunaway v. New York, 442 U.S. 200 (1979). Accordingly, his statement was obtained after an illegal seizure and must be suppressed, along with all other fruits of the illegal seizure. Wong Sun v. United States, 371 U.S. 471, 488 (1963).
"7. The defendant did not voluntarily answer questions or voluntarily make a statement, but was instead coerced into responding to the police interrogation. Bram v. United States, 168 U.S. 532 (1897); Mincey v. Arizona, 437 U.S. 385 (1978). The circumstances surrounding the interrogation were coercive. The totality of the circumstances shows that the statements were involuntary and taken in violation of federal and state constitutional guarantees.
"8. The state has failed to prove that the defendant's statements were voluntary. Lego v. Twomey, 404 U.S. 477 (1972).
"9. The defendant was not adequately advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). He did not knowingly and intelligently waive his rights, in violation of Edwards v. Arizona, 451 U.S. 477 (1981).
"10. For the foregoing reasons, his alleged statements were obtained in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and of the corresponding provisions of the Alabama Constitution, and must be suppressed."
(Headings omitted; emphasis added.)
In his motion to suppress, Walker clearly alleged, in pertinent part, that his statements should be suppressed on the ground that they were obtained as the result of an arrest not supported by probable cause. Once Walker made these allegations, the State had the burden of proving probable cause to make, the arrest. Ex parte Meeks, 434 So.2d 844, 845-46 (Ala.1983) (when a defendant makes "a motion to suppress . . . based on the ground that his arrest was without probable cause and that the evidence the State expected to use was obtained as a result of the illegal arrest," the State has the "burden of proving probable cause to make an arrest"). "When a police officer arrests without a warrant, and the defendant objects to the introduction of evidence claimed to be incident to such an arrest, the burden is on the State to show that the arrest was lawful." Duncan v. State, 278 Ala. 145, 161, 176 So.2d 840, 855 (1965). The lead opinion's holding that Walker had some initial burden to demonstrate the absence of probable cause for his arrest is clearly contrary to well-established Alabama law. The record in this case reveals that the State made absolutely no attempt to carry its burden of proving probable cause to arrest Walker.
To carry its burden of proving probable cause, the State must bring to the trial court's attention the facts upon which the arresting officer acted.
"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of arrest would `warrant a man of reasonable caution in the belief' that an offense has been committed. If the court is not informed of the facts upon which the arresting officers acted, it cannot properly discharge that function."
Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (citation omitted).
The trial court held a hearing on Walker's motion to suppress. Although it had *761 the burden of showing that Walker's arrest was supported by probable cause, the State introduced absolutely no evidence concerning the circumstances of his arrest. Instead, all the State's evidence related to Walker's allegations that his statements were involuntary and that he had not knowingly and intelligently waived his rights before he made the statements. The trial court later denied Walker's motion to suppress in a written order. The trial court concluded that the State had met its burden to prove that Walker's statements were voluntary, stating that the "statements were freely and voluntarily given after being given Miranda rights." In its order, however, the trial court did not address Walker's contention that he had been arrested without probable cause, and that, therefore, his statements should be suppressed. At trial, the State offered Walker's videotaped statement, which the trial court admitted into evidence over defense counsel's objection.
It would seem obvious that the trial court erred in admitting the videotaped statement into evidence. After all, at the suppression hearing, the State completely defaulted in its obligation to establish the constitutional validity of Walker's arrest. The arresting officer did not testify, and the State offered no evidence of the facts upon which he acted. However, the State argues that "there is considerable evidence throughout the record suggesting that a warrant existed for Walker's arrest, and that probable cause existed." State's brief, at 25-26 (emphasis added). It is true that, in reviewing "a motion to suppress a defendant's statement, fan appellate court is] not limited merely to that evidence presented at the suppression hearing, but may also consider the testimony given before the jury." Henry v. State, 468 So.2d 896, 899 (Ala.Crim.App. 1984). However, my review of the record reveals no such "considerable evidence" of the existence of a warrant or probable cause. Also, although the State admits that Walker's suppression claim appears to be "potentially meritorious," the State alleges that the claim relies "on severe misrepresentations of the record." State's brief, at 14 n. 6. However, my review of the record reveals no such misrepresentations.
Officer Ron Jones of the Hokes Bluff Police Department, the arresting officer, testified at trial. Jones testified only that he found Walker based upon information provided to him by a confidential informant. Officer Jones gave no testimony relating, directly or indirectly, to the issue of probable cause. Obviously, the State did not elicit from Officer Jones evidence sufficient to establish the constitutional validity of Walker's arrest.
In arguing that the State had probable cause to arrest Walker, the State also relies upon the trial testimony of Angela Poster, Walker's sister. According to the State, Foster "spoke to police soon after the murder, telling them that her brother and Beckworth had been acting strangely, including asking her to show that she was not wearing a police wire, and that she saw part of a .22 rifle in the trunk of her brother's car." State's brief, at 26. Walker argues that "[t]hese facts are hardly sufficient to muster a case for suspicion of any wrongdoing, let alone probable cause for the murder of Mrs. Thweatt." Walker's reply brief, at 15. I agree.
The State contends that Walker was arrested pursuant to a lawful warrant. However, the State admits that "the arrest warrant is not in the record." State's brief, at 25. My review of the trial testimony indicates that a capital-murder warrant for Walker's arrest was issued sometime after his arrest by Officer Jones. The State has not called to this Court's attention any evidence in the record indicating that a lawful warrant for Walker's *762 arrest was issued before his arrest and was relied upon as the basis for the arrest.
Based upon the record before this Court, it is clear to me that Walker was arrested without probable cause and without a lawful warrant. Consequently,
"well-established precedent requires suppression of the [videotaped statement] unless that [statement] was `an act of free will [sufficient] to purge the primary taint of the unlawful invasion.' Wong Sun v. United States, 371 U.S. 471, 486 (1963). Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State."
Kaupp v. Texas, 538 U.S. 626, 632-33, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003). Significantly, the State does not argue that it can carry its burden of persuasion regarding the purgation of the primary taint of Walker's unlawful arrest. Consequently, this Court should assume that the videotaped statement bears a sufficiently close relationship to the illegal arrest so as to require the suppression of the statement as the indirect fruit of the unlawful arrest. See New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). Thus, this Court should conclude that the trial court erred in denying Walker's motion to suppress his statement and in subsequently admitting that statement into evidence over his objection.
In Ex parte Bryant, 951 So.2d 724 (Ala. 2002), this Court addressed the application of the plain-error rule in capital cases, stating:
"`"`Plain error' arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."' Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). `"In other words, the plain-error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Ex parte Land, 678 So.2d 224, 232 (Ala. 1996) (quoting United States v. Young, 470 U.S. 1, 15 (1985)) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14[, 102 S.Ct. 1584, 71 L.Ed.2d 816] (1982)). `To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff d, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907[, 121 S.Ct. 1233, 149 L.Ed.2d 142] (2001). This Court may take appropriate action when the error has or probably has adversely affected the substantial rights of the appellant.' Rule 45A, Ala. R.App, P."
951 So.2d at 727 (emphasis added).
As stated in Ala. R.App. P. 39(a)(2)(D), the scope of our certiorari review in a death-penalty case permits this Court "to notice any plain error or defect in the proceeding under review, whether or not brought to the attention of . . . the Court of Criminal Appeals . . ., and to take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." (Emphasis added.)
The error in this case is obvious; the State completely defaulted in its obligation to show probable cause for Walker's arrest. Also, it is clear that the error "has or probably has adversely affected [Walker's] substantial rights." Here, we are dealing with the fundamental "safeguards against unreasonable arrests in the fourth amendment to the Constitution of the *763 United States and Article I, Section 5, of our state constitution." Ex parte Hamm, 564 So.2d 469, 472 (Ala.1990). These rights are of such importance that the State had the burden of proving that Walker was not arrested in violation of his constitutional rights, and it failed to do so.
It is also clear that the admission of the videotaped statement had an unfair prejudicial impact on the jury's deliberations. On the videotaped statement, Walker admitted that he had been at the scene of the crime, although he denied entering Thweatt's residence. Also, he claimed that he had run from the scene when he heard a gunshot. The district attorney obviously felt that the videotape strengthened the. State's case, because he referred to it 14 times during his guilt-phase closing arguments. Indeed, in its brief to this Court, the State does not deny that the videotaped statement was significant to the presentation of its case.
Under the circumstances of this case, this Court should find plain error, because "a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Consequently, I believe that the judgment of the Court of Criminal Appeals should be reversed, and the case should be remanded for further proceedings consistent with this dissent.
PARKER, J., concurs.
PARKER, Justice (statement of nonrecusal).
James Walker has filed a motion requesting that I recuse myself from this Court's consideration of his petition for a writ of certiorari. He argues that a guest editorial written by me and published in the Birmingham News on January 1, 2006,[5] indicates my "unwillingness to be bound by the rulings of the United. States Supreme Court" and therefore demonstrates that I am unwilling to be a "neutral and detached judge" in his case.
I first note that my guest editorial in the Birmingham News dealt with a specific case, Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and with a specific issuethe reliance of a majority of the United States Supreme Court upon foreign law in holding unconstitutional the execution of juvenile offenders. Based upon the Roper decision, this Court, in Ex parte Adams, 955 So.2d 1106 (Ala.2005), invalidated Adams's death sentence because he was a juvenile at the time he committed the murder. I had recused myself from participating in the Adams case because, in a previous position as an assistant attorney general, I had assisted in prosecuting the State's case against Adams. I therefore expressed my views in the guest editorial after the Adams case had been decided and after carefully checking to be certain no further appeals, motions, or petitions were pending before this Court in the case.
Nothing in Walker's motion suggests that he was a juvenile at the time of the murder for which he was convicted and sentenced to death. Nothing in Walker's motion indicates that his appeal is in any way based upon foreign law or upon American cases interpreting the United States Constitution based on foreign law. Therefore, he has presented no reason to conclude that I am unable to sit as a "neutral and detached judge" in his case.
Walker observes that as a Justice of this Court I have taken an oath to support the Constitution of the United States and the Constitution of the State of Alabama. In this observation he is absolutely correct. *764 But it is a leap of logic to conclude, from the fact that I have taken an oath to support the United States Constitution, that I am thereby bound to support every judicial gloss any court has ever given the Constitution. In fact, if a conflict exists between the plain words of the Constitution as understood by its Framers and an erroneous court opinion that is based upon foreign law, my oath requires me to follow the Constitution, not the opinion of a court.
In my guest editorial, I expressed my dismay at the Roper decision because "[t]he justices based their ruling not on the original intent or actual language of the U.S. Constitution, but on foreign law, including United Nations treaties." I noted that "one of the U.N. treaties invoked by the U.S. Supreme Court as a basis for its Roper decision is a treaty the United States has refused to sign" and that "[b]y insisting that American states submit to this unratified treaty, the liberals on the U.S. Supreme Court not only unconstitutionally invalidated laws in 20 states but, to do so, also usurped the treaty-making authority of both the President and the U.S. Senate."
Had space permitted, I could have gone further in my guest editorial and noted that the Roper Court received and specifically cited amici curiae briefs from the European Union and from the Human Rights Committee of the Bar of England and Wales, 543 U.S. at 576, 125 S.Ct. 1183. With this background, and noting that Roper was a 5-4 decision and that two Justices had been appointed who had not been on the United States Supreme Court when Roper was decided, I wrote that this Court should have declined to follow Roper and given the United States Supreme Court, and especially its new Chief Justice and Associate Justice, an opportunity to reconsider and overrule Roper.
The irony is that the Roper case came to the United States Supreme Court because the Missouri Supreme Court in State ex rel. Simmons v. Roper, 112 S.W.3d 397 (Mo.2003), refused to follow United States Supreme Court precedent in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).
No one has yet explained to my satisfaction why it is proper for the Missouri Supreme Court to rule that juvenile executions are not constitutional even though the United States Supreme Court had held in Stanford that they are constitutional, but it is somehow improper for me to suggest that the Alabama Supreme Court should have ruled that juvenile executions are constitutional even though the United States Supreme Court has held in Roper that they are not constitutional. Both are proper means of giving the United States Supreme Court an opportunity to reconsider a controversial and divided previous decision.
Based upon this narrowly written guest editorial, Walker claims that I have "publicly announced that [I] will not apply binding federal constitutional law with which [I] personally disagree[]." As the above explanation and the attached guest editorial itself clearly demonstrate, I made no such announcement.
Walker says his petition for the writ of certiorari is based in part upon United States Supreme Court decisions. Roper v. Simmons is not among these decisions, and none of the Supreme Court decisions cited by Walker rely upon foreign law.
For example, Walker's petition argues that the prosecutor illegally exercised his peremptory strikes in a racially discriminatory manner. In support of this contention, he relies upon Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Powers decision does not rely upon foreign law, though it does contain a reference *765 to the French observer Alexis de Tocqueville's Democracy in America, 499 U.S. at 406-07, 111 S.Ct. 1364. J.E.B. does not rely upon foreign law, though it does contain a brief reference to William Blackstone's Commentaries, a source relied upon by the Framers in shaping American law, 511 U.S. at .132, 114 S.Ct. 1419.
Walker argues in his petition that his videotaped statement was obtained in violation of the requirements of the Fourth and Fifth Amendments to the United States Constitution and that it therefore should have been suppressed. In support of this argument he relies upon Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Taylor contains no reference to foreign law.
Walker argues in his petition that his death sentence violates the prohibition against cruel and unusual punishment found in the Eighth Amendment to the United States Constitution. In support of this argument he relies upon Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); Eddings v. Oklahoma, 455 U.S. 104, 102 "S.Ct. 869, 71 L.Ed.2d 1 (1982); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). None of these cases involves the foreign-law concerns raised in my guest editorial.
For example, Mills v. Maryland contains no reference at all to foreign law. Eddings v. Oklahoma contains a brief reference to English common law and states that the Framers of our Constitution and Bill of Rights attempted to soften the rigor of England's mandatory death sentences. 455 U.S. at 111, 102 S.Ct. 869. This brief reference is unrelated to the concerns I expressed in my guest editorial. Similarly, Woodson v. North Carolina notes that at the time our Bill of Rights was adopted, England prescribed the death penalty for over 200 crimes, and the Framers sought to limit the types of cases in which capital punishment could be imposed. 428 U.S. at 289, 96 S.Ct. 2978.
The per curiam opinion in Furman v. Georgia likewise contains no reference to foreign law. References to foreign sources do appear in the concurring opinions of Justices Douglas, Brennan, and Marshall, but those references do not constitute reliance upon foreign law. Justice Douglas notes in his concurring opinion that in ancient Hindu law a Brahman (a member of the upper caste) was exempt from capital punishment and that punishment generally increased in severity as social status diminished. 408 U.S. at 255, 92 S.Ct. 2726. But Justice Douglas did not rely upon Hindu law; rather, he cited the Code of Manu negatively to illustrate his view that because in the United States wealthy persons are less likely to be executed than poor persons, the United States follows in practice what the Code of Manu made explicit. Justice Douglas also cited the Bloody Assizes of 17th century England as the cruel form of capital punishment our Framers were reacting against. He noted that England authorized the death penalty for many more types of offenses than did America and that in the early 1800s England authorized capital punishment for theft of more than five shillings but repealed that provision in 1827. 408 U.S. at 246 n. 9, 92 S.Ct. 2726.
Likewise, in Furman Justice Brennan in his concurring opinion observed that "this country never embraced the more violent and repulsive methods employed by England," 408 U.S. at 296, 92 S.Ct. 2726, and that "[w]hen this country was founded, memories of the Stuart horrors were fresh and severe corporal punishments were common." 408 U.S. at 305, 92 S.Ct. 2726.
*766 Also in Furman, Justice Marshall in his concurring opinion cited the Philippine Bill of Rights but noted that it was "borrowed from the Eighth Amendment to the U.S. Constitution and had the same meaning." 408 U.S. at 325 n. 21, 92 S.Ct. 2726. He claimed the Babylonian Code of Hammurabi as source for the lex talionis principle of "an eye for an eye, a tooth for a tooth." 408 U.S. at 333 n. 41, 92 S.Ct. 2726. In several instances he cited the English Royal Commission on Capital Punishment (1949-1953), as well as other English and Canadian sources and a United Nations committee, as to the effectiveness of capital punishment as a deterrent to crime. 408 U.S. at 342 n. 84, 347-51, 353, 92 S.Ct. 2726.
None of the above references constitutes a reliance upon foreign law. I do not object to evidence from foreign sources, provided it is competent and relevant to the issue at hand in an American court. And I consider it entirely appropriate to cite the historic practices of other nations as evidence of the Framers' perceptions and intent. The Framers derived their concepts of government from a wide variety of sources, including the Bible, Black-stone, Montesquieu, Locke, Cicero, Cato, Solon, and others. The Federalist Papers are replete with illustrations from the history of other nations that help to explain why the Framers adopted certain ideas that had worked in other nations, and, more frequently, why they rejected practices that had failed elsewhere. It is entirely proper to use such sources when they shed light on the meaning of the Constitution as intended by its Framers.
I do not object to the use of foreign sources from the time of our nation's founding and earlier to help clarify the meaning of our Constitution. But as stated in my guest editorial, I do object to the activist judiciary's reliance upon contemporary foreign sources to force the American people to change their laws and institutions to conform to the changing laws and opinions of other countries.
Nothing in my guest editorial, and none of the caselaw cited by Walker, gives me any reason to believe I cannot consider his petition fairly and impartially.
A motion to recuse is a serious matter, because it involves a tension between two judicial duties: (1) a duty to decide cases; and (2) a duty to recuse where bias or an appearance of bias exists. As Justice See observed in his statement of nonrecusal in Dunlop Tire Corp. v. Allen, 725 So.2d 960 (Ala.1998): "The Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases." 725 So.2d at 976. Clearly, the duty to decide cases is the norm; the duty to recuse is the exception.
Alabama Code 1975, § 12-2-1, provides that this Court "shall consist of a chief justice and eight associate justices. . . ." This means that, with rare exceptions, litigants before this Court are entitled to have their cases heard and considered by as full a complement of Justices as is possible. When a Justice recuses himself from a case, the litigants and the public are forced to submit to deliberation by less than a full panel of. Justices, and the vote of, and valuable input from, the recused Justice is lost. The people of the State of Alabama have elected me to decide cases like this one, and I would be shirking my constitutional duty if I were to recuse myself from this case absent some compelling reasons to do so. If judges and Justices were to make a practice of recusing themselves without compelling reasons, they would encourage litigants to engage in forum-shopping and filing motions for recusal in an attempt to shape judicial panels to their own liking. See Dunlop Tire Corp. v. Allen, 725 So.2d at 977; Ham v. *767 State, 540 So.2d 805, 807 (Ala.Crim.App. 1988).
After careful consideration, I have concluded that no compelling reasons for my recusal exist in this case. As the Court of Criminal Appeals observed in Carruth v. State, 927 So.2d 866, 873 (Ala.Crim.App. 2005):
"`All judges are presumed to be impartial and unbiased,' Woodall v. State, 730 So.2d 627, 638 (Ala.Crim.App.1997), aff'd in pertinent part, rev'd on other grounds, 730 So.2d 652 (Ala.1998), and `[t]he burden i[s] on the party making a motion to recuse to establish that the trial judge is biased or prejudiced against the defendant.' Stallworth v. State, 868 So.2d 1128, 1140 (Ala.Crim. App.2001)."
Canon 3.C(1), Alabama Canons of Judicial Ethics, provides, in pertinent part:
"C. Disqualification
"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . . "
In Ex parte Duncan, 638 So.2d 1332 (Ala.1994), this Court explained:
"Under Canon 3(C)(1), Alabama Canons of Judicial Ethics, recusal is required when `facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge.' Acromag-Viking v. Blalock, 420 So.2d 60, 61 (Ala.1982). Specifically, the Canon 3(C) test is: `Would a person of ordinary prudence in the judge's position knowing all of the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?' Matter of Sheffield, 465 So.2d 350, 356 (Ala.1984)."
638 So.2d at 1334.
As this Court said in 1989, "Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source." Ex parte Melof, 553 So.2d 554, 557 (Ala.1989). Walker has presented no evidence whatsoever to suggest that I have any personal bias against him, and in fact I have none.
In Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct, 2528, 153 L.Ed.2d 694 (2002), the United States Supreme Court invalidated certain restrictions on the expression of opinions by judges and judicial candidates. Justice Scalia, the author of the plurality opinion, opined that the term "impartiality" may have at least three possible interpretations:
"One meaning of `impartiality' in the judicial contextand of course its root meaningis lack of bias for or against either party to the proceeding. Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party. This is the traditional sense in which the term is used. . . .
". . . .
"It is perhaps possible to use the term "impartiality' in the judicial context (though this is certainly not a common usage) to mean lack of preconception in favor of or against a particular legal view. This sort of impartiality would be concerned, not with guaranteeing litigants equal application of the law, but rather with guaranteeing them an equal chance to persuade the court on the legal points in their case. Impartiality in this sense may well be an interest served by the announce clause [which *768 prohibited a candidate for judicial office in Minnesota from announcing a position on a disputed legal or political issue], but it is not a compelling state interest, as strict scrutiny requires. . . .
"A third possible meaning of `impartiality' (again not a common one) might be described as open-mindedness. This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case."
536 U.S. at 775-78, 122 S.Ct. 2528 (emphasis in original). Only in the first sense, that of a lack of personal bias for or against a party, could the state's interest. in ensuring impartiality be considered compelling so as to justify restrictions on freedom of expression.
Likewise, then Justice Rehnquist observed in Laird v. Tatum, 409 U.S. 824, 835, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), in denying a motion seeking his recusal:
"Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions that would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It Would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."
In no way has Walker even suggested, let alone proven, that I have any bias against him personally, and as previously stated, I have none. Nor does his assertion that I have stated an opinion about a legal and constitutional issue establish that I am unable to consider his case with an open mind.
Furthermore, the prevalence of judicial activism makes it even more important that judges state their legal and political views so the voters can make informed decisions when they cast their ballots. This might be less true if judges strictly practiced judicial restraint. But as Stephen J. Ware stated in Money, Politics and Judicial Decisions: A Case Study of Arbitration Law in Alabama, 30 Cap. U.L.Rev. 583, 594 (2002), it is a "myth that courts are apolitical and do not make policy. The Legal Realists exploded that myth and showed that judges do make policy. This is especially true of judges on the states' highest courts." Like the citizens in 30 other states, Alabamians have chosen to elect their judges and Justices. They therefore have a right and a duty to learn what judicial candidates believe about legal and constitutional issues. If judges are prohibited from expressing opinions on such issues, it becomes extremely difficult for the voters to make informed decisions.
I observe, further, that judges and Justices regularly express opinions on legal issues in the cases they decide. The fact that a judge or Justice has written an opinion on a case and a higher court then decides the case differently from the way that judge or Justice wrote that opinion does not mean that judge or Justice is thereafter disqualified from deciding similar cases. If I had participated in the Adams case and had issued a dissenting opinion expressing exactly the same views I expressed in the guest editorial, I would not be subject to recusal in a later case dealing with the same issue. The only difference is that in the Adams case I expressed my views in a guest editorial rather than in a dissenting opinion. I fail *769 to see why that distinction makes any difference as to my duty to recuse myself.
This is a death-penalty case. Believing as I do that all human life is created in God's image and is therefore of infinite value, I take this case very seriously and will give Walker's arguments my most careful consideration.
Because no compelling reasons for my recusal exist, as Justice Brown wrote in her statement of nonrecusal in Brackin v. Trimmier Law Firm, 897 So.2d 207, 230 (Ala.2004), "I have determined that I am not disqualified from deciding the appeal . . . and that it is my constitutional duty to decide this case. I, therefore, decline to recuse myself."

APPENDIX
Alabama justices surrender to judicial activism
By Tom Parker
(as printed in the Birmingham News, January 1, 2006)
In 1997, a vicious thug entered the home of a pregnant Alabama woman. He raped and repeatedly stabbed her, then fled, leaving her to die in a house with three other children. Police acted swiftly and caught the attacker, Renaldo Adams, literally red-handed with blood. After a fair trial, Adams was convicted of rape and murder and given the death penalty. It took the jury less than 30 minutes to recommend his execution.
As an assistant attorney general under then Attorney General (now U.S. Sen.) Jeff Sessions, I helped prosecute Adams and was satisfied the Alabama jury chose the punishment that best fit his crime. Consequently, I was shocked to learn the Alabama Supreme Court just freed Adams from Death Row.
Although I am now a justice of the Alabama Supreme Court, I had to recuse from any involvement in Adams' case because I helped prosecute him. Because I believe the court's decision illustrates a serious problem with our judicial system, however, I write to explain what I regard as a failure to defend our Constitution and laws against activist federal judges.
You see, my fellow Alabama justices freed Adams from Death Row not because of any error of our courts but because they chose to passively accommodaterather than actively resistthe unconstitutional opinion of five liberal justices on the U.S. Supreme Court.
Those liberal justices declared last spring in the case of Roper v. Simmons that "evolving standards of decency" now make it "unconstitutional" to execute murderers who were minors at the time of their crime. The justices based their ruling not on the original intent or actual language of the U.S. Constitution, but on foreign law, including United Nations treaties.
Ironically, one of the U.N. treaties invoked by the U.S. Supreme Court as a basis for its Roper decision is a treaty the United States has refused to sign. By insisting that American states submit to this unratified treaty, the liberals on the U.S. Supreme Court not only unconstitutionally invalidated laws in 20 states but, to do so, also usurped the treaty-making authority of both the president and the U.S. Senate.
I am not surprised the liberal activists on the U.S. Supreme Court go to such lengths to usurp more political power. I am also not surprised they use such ridiculous reasoning to try to force foreign legal fads on America. After all, this is the same, court that has declared state displays of the Ten Commandments to be unconstitutional.
But I am surprised, and dismayed, that my colleagues on the Alabama Supreme *770 Court not only gave in to this unconstitutional activism without a word of protest but also became accomplices to it by citing Roper as the basis for their decision to free Adams from Death Row.
The proper response to such blatant judicial tyranny would have been for the Alabama Supreme Court to decline to follow Roper in the Adams case. By keeping Adams on Death Row, our Supreme Court would have defended both the U.S. Constitution and Alabama law (thereby upholding their judicial oaths of office) and, at the same time, provided an occasion for the U.S. Supreme Court, with at least two new members, to reconsider the Roper decision.
After all, Roper itself was established as new U.S. Supreme Court "precedent" only because the Missouri Supreme Court refused to follow prior precedent. The U.S. Supreme Court used the appeal resulting from the Missouri decision to overturn its previous precedent and declined to rebuke the state court for disregarding the prior precedent.
State supreme courts may decline to follow bad U.S. Supreme Court precedents because those decisions bind only the parties to the particular case. Judges around the country normally follow precedents in similar cases because they know that if those cases go before the court again they are likely to receive the same verdict. But state supreme court judges should not follow obviously wrong decisions simply because they are "precedents."
After all, a judge takes an oath to support the Constitutionnot to automatically follow activist justices who believe their own devolving standards of decency trump the text of the Constitution. Thus, faithful adherence to the judicial oath requires resistance to such activism, and a changing U.S. Supreme Court membership makes such resistance more likely to bear good fruit.
The Adams case presented the Alabama Supreme Court with the perfect opportunity to give the new U.S. Supreme Court the occasion to overturn the unconstitutional Roper precedent. If our court had voted to uphold Adams' death penalty, he would have appealed the decision to the U.S. Supreme Court. Because the U.S. Supreme Court can accept only a handful of the petitions it receives, the court may not have heard the case at all, and Adams would have been executed as he deserves. However, if the new John Roberts-led court had taken the case, it could very well have overturned Roper.
But even if, in the worst-case scenario, the Roberts court had taken the Adams case but failed to overturn Roper, the Alabama Supreme Court would have been none the worse for standing up against judicial activism.
After all, the liberals on the U.S. Supreme Court already look down on the pro-family policies, Southern heritage, evangelical Christianity and other blessings of our great state. We Alabamians will never be able to sufficiently appease such establishment liberals, so we should stop trying and instead stand up for what we believe without apology.
Conservative judges today are on the front lines of the war against political correctness and judicial tyranny. Happily, Alabama's Supreme Court has a reputation of being one of the most conservative in the nation.
However, it does no good to possess conservative credentials if you surrender them before joining the battle.
Tom Parker, a graduate of Dartmouth College and Vanderbilt Law School, is an *771 associate justice of the Alabama Supreme Court.
NOTES
[*] Note from the reporter of decisions: The Court of Criminal Appeals' opinion in this case was released for publication in the official reports on July 28, 2005, following the Court of Criminal Appeals denial of rehearing on March 11, 2005, and the issuance of its certificate of judgment on March 30, 2005. On September 8, 2005, the Court of Criminal Appeals set aside the certificate of judgment issued on March 30, 2005, and placed the case on rehearing ex mero motu. On that same date, September 8, 2005, that court entered the following notation in its docket sheet: "Application for Rehearing Overruled." The opinion of the Court of Criminal Appeals is published at 932 So.2d 140.
[1] With regard to the juror questionnaire; the trial court instructed:

"Please answer the questions as best you are able, and be sure to sign your name to the questionnaire. This is just as important as the questions that are asked of you by the Court and by the attorneys.
". . . And, additionallyone of the reasons we're going to do this questionnaire early and today is that these attorneys will pour over that information tonight. . . . "
[2] Walker specifically directs this Court's attention to the State's use of its peremptory challenges against four African-American females. According to Walker, the record does not provide nondiscriminatory reasons for the State's, peremptory strikes of these prospective jurors. Our review of the juror questionnaires, however, indicates that the State had nondiscriminatory reasons for the strikes because these prospective jurors either had relatives who had been convicted of a crime or had relatives who had been murdered and the prosecution of the accused was pending. See Ex parte McNair, 653 So.2d 353 (Ala.1994), and Ex parte Drinkard, 777 So.2d 295 (Ala. 2000).
[3] In his discussion of this issue, Walker includes a "grocery list" of alleged prosecutorial conduct with regard to Byrd and his testimony. We have read Byrd's testimony and the arguments in their entirety, and we find no reversible error.
[4] In addition to the motion to suppress discussed in the main opinion, Walker filed a motion in limine.
[5] Walker attached a copy of the guest editorial as an exhibit to his motion to recuse. I have included a copy of the editorial as an appendix to this statement of nonrecusal.